BYRON H. FARWELL AND MARTHA ALLAN FARWELL, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 71041–71045. Filed December 29, 1960.

---

[1] Proceedings of the following petitioners are consolidated herewith: Felix H. Farwell and Margaret Farwell, Docket No. 71042; Lyman H. Farwell and Catherine S. Farwell. Docket No. 71043; George Parker Ryan and Clara Clarke Ryan, Docket No. 71044; and Estate of Milton P. Griswold, Deceased, Docket No. 71045.

*Max L. Gillam, Esq.*, and *Austin H. Peck, Esq.*, for the petitioners.
*James Q. Smith, Esq.*, for the respondent.

ATKINS, *Judge:* The respondent determined deficiencies in income tax and additions to tax as follows:

| Docket No. | Petitioner | Year | Deficiency | Addition to tax, sec. 6653(a), I.R.C. 1954 |
|---|---|---|---|---|
| 71041 | Byron H. Farwell and Martha Allan Farwell | 1953 | $8,530.14 | |
|  |  | 1954 | 5,040.60 | |
|  |  | 1955 | 3,883.35 | |
| 71042 | Felix H. Farwell and Margaret Farwell | 1953 | 8,106.26 | |
|  |  | 1954 | 6,855.32 | $342.77 |
|  |  | 1955 | 4,145.81 | |
| 71043 | Lyman H. Farwell and Catherine S. Farwell | 1953 | 7,978.49 | |
|  |  | 1954 | 4,856.36 | |
|  |  | 1955 | 4,149.91 | |
| 71044 | George Parker Ryan and Clara Clarke Ryan | 1953 | 3,254.42 | |
|  |  | 1954 | 2,290.16 | |
|  |  | 1955 | 1,842.90 | |
| 71045 | Estate of Milton P. Griswold, Deceased, Lucile Y. Griswold, Executrix, and Lucile Y. Griswold, Surviving Wife | 1953 | 1,934.14 | |
|  |  | 1954 | 720.06 | |

The principal issue in each case is whether the petitioners are entitled, under their assignment of their interest in a lease, to depletion computed upon the basis of gross production (after deduction of royalties) or upon net profits payable to them. A further issue presented in Docket Nos. 71041, 71042, and 71043 relates to the deductibility of amounts paid to a title insurance company for an examination of deeds and records relating to property lines and for a title insurance policy. In Docket No. 71042 an issue is presented as to whether petitioners are liable for an addition to tax for negligence, under section 6653(a) of the Internal Revenue Code of 1954. An issue has been raised as to the proper amount of deductible medical expenses in

Docket No. 71041 for the year 1955, which depends upon the findings and opinion with respect to other issues.

### FINDINGS OF FACT.

Some of the facts are stipulated and the stipulations are incorporated herein by this reference.

The petitioners, Byron H. Farwell and Martha Allan Farwell, husband and wife, and Lyman H. Farwell and Catherine S. Farwell, husband and wife, reside in Balboa, California; Felix H. Farwell and Margaret Farwell, husband and wife, reside in Beverly Hills, California; George Parker Ryan and Clara Clarke Ryan, husband and wife, reside in Santa Fe Springs, California; Lucile Y. Griswold resides in Santa Monica, California.

The income tax returns of all of the above-named petitioners were joint returns filed on the cash method of accounting and a calendar year basis with the director of internal revenue for the sixth district of California at Los Angeles.

The petitioner George P. Ryan is a licensed petroleum engineer, a licensed chemical engineer, and sole owner of a firm organized in 1928 or 1929, known as Oil Field Testing and Engineering Company, which engages in the business of representing owners of oil-producing properties, such as advising whether the terms of their leases are being complied with. Milton P. Griswold was formerly a partner in such firm.

Prior to December 31, 1948, Flora Farwell, mother of the petitioners Byron, Felix, and Lyman Farwell, was the owner of real property at Santa Fe Springs, California, which was under lease to Union Oil Company of California. Ryan represented her with respect to such lease. Ryan examined Union's title to the lease and concluded that Union's drilling rights had expired. Accordingly, sometime prior to December 31, 1948, he had Union quitclaim to her all the lands subject to the lease, except for 440-foot squares surrounding each of Union's wells on the property. It was Ryan's conviction, at the time that the quitclaim deed was obtained, that the land could produce more oil and gas, and that it was valuable property.

At about this time Ryan, the three Farwell brothers, and Griswold, hereinafter called the Farwell group, entered into discussions leading to an oral agreement among themselves that they would enter into an oil and gas lease with Flora Farwell and thereafter drill a well or two on the property to determine whether Ryan's opinion as to its value was correct. They agreed to divide any profits into four shares, Ryan and Griswold to take one share between them on a 60–40 per cent basis. They also agreed to take the lease in Ryan's name as a convenience.

On December 31, 1948, a lease was executed between Flora Farwell, as lessor, and Ryan, as lessee. The lease gave Ryan the sole and exclusive right to drill for, produce, extract, and take hydrocarbons from the land; the term was for 20 years and so long thereafter as hydrocarbons were produced in paying quantities; Ryan was to have the use, control, and possession of the premises; he was required to spud in and commence the drilling of a well within 180 days and to prosecute drilling continuously; if hydrocarbons were not discovered in paying quantities, then Ryan was required to drill additional wells with not more than 90 days intervening; he was obligated to operate each well continuously and to its full capacity; he agreed to pay as rental or royalty 16⅔ per cent of all oil or hydrocarbon substance (except gas) produced and saved therefrom, said payment to be made in money or kind at the option of the lessor; lessor was entitled to 16⅔ per cent of all the gas in excess of that used for fuel by Ryan, but Ryan was not obligated to save gas; royalty money on oil or gas was to be paid on the 20th day of each month from the proceeds of sales of the preceding month; and Ryan agreed that he would pay the royalty as and when due and that he would keep, perform, and observe at his own expense all of the provisions of the lease. On March 31, 1949, Flora Farwell and Ryan entered into an amendment to the lease whereby the time for commencing to drill the first well was extended to September 1, 1949; that such well would be drilled in one of three designated areas and that the second and third wells would be drilled in the other two of the three designated areas.

On April 4, 1949, Ryan executed an instrument assigning the lease to himself, the Farwell brothers, and Griswold as tenants-in-common. At this time Ryan and Byron Farwell were planning a trip to Europe, and for that reason were reluctant to undertake any development work under the lease. They considered getting an extension of the time for drilling but decided, instead, to get someone else to operate the lease. Accordingly, Ryan approached several operators. He discussed the matter with John Woodward, president of St. Anthony Oil Corporation, and as a result he drafted a proposed agreement and submitted it to St. Anthony on behalf of the Farwell group. Woodward made no significant changes therein, and on April 19, 1949, the Farwell group, parties of the first part, and the St. Anthony Oil Corporation, second party, executed a document entitled "Assignment and Agreement." Therein the Farwell group assigned to St. Anthony all their right, title, and interest in the oil and gas lease and its amendment, reserving, however, 8⅓ per cent of the gross oil and gas produced from zones above the bottom of the Clarke zone and 3⅓ per cent of the gross oil and gas produced from zones below the Clarke zone. The agreement further provided:

II. First parties further reserve to themselves 25% of all oil, gas and other

hydrocarbons produced on said land after second party makes the following deductions from all of said oil, gas and other hydrocarbons:

(a) Payment of the following royalties:

(1) Royalties on oil, gas and other hydrocarbons produced from a zone or zones above the Clarke zone—

|  | Per cent |
|---|---|
| Lessor's royalty under the terms of said oil and gas lease | 16.6667 |
| First parties hereto | 8.3333 |
| | 25.0000 |

(2) Royalties on oil, gas and other hydrocarbons produced from a zone or zones below the bottom of the Clarke zone—

|  | Per cent |
|---|---|
| Lessor's royalty under the terms of said oil and gas lease | 16.6667 |
| First parties hereto | 3.3333 |
| | 20.0000 |

Provided that if the lessor and/or any or all of the above named owners of royalty interests in said oil elect to take their share of the oil, gas and other hydrocarbons in kind instead of in money, then said oil, gas and other hydrocarbons shall be delivered to them and no part of the proceeds of the sale shall be so delivered in money.

(b) Payment of all taxes and assessments paid by second party, including ad valorem, personal property, mineral rights, gross production, California Petroleum and Gas Fund assessment, and any other taxes and assessments levied and assessed against second party in its operations on the herein described premises. (No deduction shall be made for income, franchise and other such general taxes.)

(c) Payment of all drilling and development costs, and operating expenses, which shall include labor, casing and all necessary equipment, the maintenance, pumping, cleaning out, repairing, and redrilling of wells, together with cleaning of oil, payments for claims for damages, and costs of litigation with second party's lessor or those claiming under her, or in hostility to her title, a sum for supervision and management equal to five (5%) per cent of the total of all said expenses; and, without limitation by reason of the specific recitals herein enumerated, any expenditures reasonably appropriate to the proper development of the demised land and the handling of the oil and/or gas therefrom.

III. In the event first parties take their oil, gas and other hydrocarbons in kind, second party shall deliver to first parties 25% of the total quantity of oil, gas and other hydrocarbons produced, after first deducting from said total a quantity of oil, gas and other hydrocarbons with a value equal to the value of the royalty oil delivered or sold as provided in clause II(a)(1) and (a)(2) and after deducting from said total a quantity of oil, gas and other hydrocarbons with a value equal to the operating expenses as set forth in clause II (b) and (c). Said value of oil, gas and other hydrocarbons shall be that value provided for in said oil and gas lease for the purpose of royalty accounting.

The settlement and payment by second party to first parties shall be made on the 20th day of each month for the production of oil, gas and other hydrocarbons in the preceding calendar month.

*       *       *       *       *       *       *

VI. In the event of the surrender of said lease, or in the event of the assignment thereof, or of any part thereof, or other termination of the rights of second party therein, second party shall have the right to remove from the affected land any and all of its improvements, houses, tanks, pipe lines, structures, cas-

ing, and any and all other equipment, appurtenances and appliances of any kind owned or controlled by it, whether affixed to the soil or not, and which it has a right to remove under the terms of said oil and gas lease and the extension and amendment thereto.

First parties shall be entitled to a credit of twenty-five per cent (25%) of the salvage value of all equipment and apparatus placed upon said land under the terms and conditions hereof and removed therefrom by second party as and when the same is paid for out of the proceeds of the oil and/or gas in the manner herein provided.

\*     \*     \*     \*     \*     \*     \*

VIII. Second party shall not be liable to first parties for any act done in the exercise of its judgment in developing or operating said land. Second party will at all times hold the first parties harmless from any damage or liability to any third person by reasons of operations conducted by second party upon said premises.

The above contract represented the most favorable agreement the Farwell group could get from St. Anthony. The reserved 25 per cent interest referred to in the contract was owned in the following proportions:

|  | Per cent |
|---|---|
| Byron H. Farwell | 6.25 |
| Lyman H. Farwell | 6.25 |
| Felix H. Farwell | 6.25 |
| George P. Ryan | 3.75 |
| Milton P. Griswold | 2.50 |
| | 25.00 |

The group never loaned any money to St. Anthony, and never endorsed any notes for St. Anthony.

St. Anthony drilled 24 wells on the property—3 in 1949, 4 in 1950, 3 in 1951, 6 in 1952, 4 in 1953, 3 in 1954, and 1 in 1955. The wells began producing revenue in 1949. Throughout 1949, 1950, and a part of 1951 all the revenue was used to pay overriding royalties, drilling costs, lease expenses, production expenses, cost of materials, and management and supervision costs. Thereafter and during each month of each of the years in question, except March 1953, March 1954, and February 1955, they received cash payments pursuant to their reserved 25 per cent interest.

Each month St. Anthony submitted to petitioners, generally on forms headed either "STATEMENT OF OIL ROYALTIES" or "STATEMENT OF OIL SALES," cumulative information relating to sales, expenses, and royalties paid. Such statements generally bore the further statement "STATEMENT OF FARWELL PARTICIPATING ROYALTIES" or "FARWELL PARTICIPATING." In such statements St. Anthony showed the net amounts distributed to each petitioner.

St. Anthony also rendered to the group monthly detailed statements of costs and expenses. By letter to St. Anthony dated July 18, 1950, Ryan questioned certain charges for office salaries, insurance, title insurance, legal expenses, a trailer, and testing, stating that these

were covered by the 5 per cent allowed in the contract for supervision and management. After conferences with Woodward, certain of the charges were eliminated and it was agreed that St. Anthony would be entitled to a bookkeeping charge of $25 per well per month. In each of the years at issue St. Anthony, as operator of the property, charged total bookkeeping expenses of $5,700 in 1953, $6,525 in 1954, and $7,700 in 1955, in addition to the 5 per cent charge.

During each of the years at issue Los Angeles County mining rights taxes were paid by St. Anthony with reference to the lease, and personal property taxes were paid with reference to personal property located on the leased property, in the following amounts:

| Year | Mining rights tax | Personal property tax |
|---|---|---|
| 1953 | $60,342.27 | $6,908.04 |
| 1954 | 70,940.88 | 7,420.67 |
| 1955 | 72,169.55 | 8,146.75 |

The Los Angeles County mining rights tax and personal property tax constitute ad valorem property taxes.

As of December 31, 1952, and with reference to the lease, total drilling costs had been incurred in the amount of $1,047,523.84 of which $452,588.81 was allocable to tangibles. In each of the following years, total drilling costs and the portions thereof allocable to tangibles were as follows:

| Year | Drilling costs | Tangibles |
|---|---|---|
| 1953 | $344,739.72 | $131,518.50 |
| 1954 | 225,735.19 | 97,507.38 |
| 1955 | 113,067.80 | 37,600.15 |

For the years 1949 and 1950 the petitioners reported no income on their Federal income tax returns with respect to the 25 per cent interest reserved by them under the agreement with St. Anthony. They claimed no depletion, deducted no intangible expenses, capitalized no tangibles, and took no depreciation with respect to the reserved 25 per cent interest. Beginning in 1951 St. Anthony filed information returns, Form 1099, in the name of each individual reflecting as "Rents and Royalties" the net payments made to him.

For the years 1951 through 1955, both inclusive, the petitioners included as income in their Federal income tax returns amounts equivalent to total production from 25 per cent of the gross working interest, each including the proportion agreed upon, as set forth in the assignment.[2] They took depletion deductions of 27½ per cent

---

[2] The matter in this paragraph was stipulated. However, it appears that the aggregate reported by Ryan and Griswold for each year does not equal the amount reported by each of the Farwell brothers. This may indicate that Ryan and Griswold had disposed of a portion of their share, although the record contains no explanation. In any event, the variation between the stipulation and the actual facts is not of any significance in deciding the basic issues.

of the amount reported as income, and deducted 25 per cent of the cost of tangibles and intangibles and of other expenses, also in the same proportion. They did not capitalize 25 per cent of the tangibles and did not take depreciation with respect thereto.

The following tabulation sets forth the amounts shown by the petitioners on their returns as their gross income from the lease, the net amounts received, the depletion and expense deductions claimed, and the net income from the lease:

| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
|-----|-----|-----|-----|-----|-----|-----|
| Year | Gross income from oil lease | Amount expended by St. Anthony for taxes, dehydration, and drilling and production expenses [1] | Net cash received from St. Anthony | Depletion claimed | Drilling, production, and other expenses claimed [2] | Net taxable income from lease |
| Byron Farwell | | | | | | |
| 1953 | $225,790.35 | $34,131.64 | $191,658.71 | $62,092.35 | $35,247.82 | $128,450.18 |
| 1954 | 197,007.91 | 30,055.38 | 166,952.53 | 54,177.17 | 30,998.42 | 111,832.32 |
| 1955 | 160,415.84 | 25,251.15 | 135,164.69 | 44,114.36 | 25,251.15 | 91,050.33 |
| Lyman Farwell | | | | | | |
| 1953 | $225,790.36 | $34,131.66 | $191,658.70 | $62,092.35 | $34,131.66 | $129,566.35 |
| 1954 | 197,007.94 | 30,055.39 | 166,952.55 | 54,177.18 | 30,055.39 | 112,775.37 |
| 1955 | 160,420.85 | 25,256.11 | 135,164.74 | 44,115.73 | 25,256.11 | 91,049.01 |
| Felix Farwell | | | | | | |
| 1953 | $225,790.33 | $34,131.64 | $191,658.69 | $62,092.35 | $35,914.48 | $127,783.50 |
| 1954 | 197,007.92 | 30,055.37 | 166,952.55 | 54,177.18 | 30,882.52 | 111,948.22 |
| 1955 | 160,415.82 | 25,251.11 | 135,164.71 | 44,114.35 | 26,245.83 | 90,055.64 |
| Ryan | | | | | | |
| 1953 | $74,415.54 | $18,431.01 | $55,984.53 | $20,464.27 | $18,431.01 | $35,520.26 |
| 1954 | 64,928.14 | 15,620.88 | 49,307.26 | 17,855.24 | 15,620.88 | 31,452.02 |
| 1955 | 52,870.87 | 12,721.20 | 40,149.67 | 14,539.49 | 12,721.20 | 25,610.18 |
| Griswold | | | | | | |
| 1953 | $49,611.61 | $12,287.39 | $37,324.22 | $13,643.19 | $12,287.39 | $23,681.03 |
| 1954 | 29,302.30 | 8,381.01 | 20,921.29 | 8,058.13 | 8,381.01 | 12,863.16 |

[1] As indicated, the amounts shown in this column include taxes paid by St. Anthony; for example, the item of $34,131.66 for Lyman Farwell for 1953 is made up of dehydration, $83.82, mining rights tax, $4,609.45, and production and drilling expenses, $29,438.39.

[2] In some instances includes some expenditures, such as county taxes, paid by petitioners.

In determining the deficiencies for each of the years against each petitioner the respondent determined that the petitioners did not receive the full amount of gross income reported from the lease, that the gross income should be reduced by an amount equivalent to the drilling and production expenses paid by St. Anthony, and that depletion should be computed on the reduced gross income. The explanation given by the respondent in each case was the same. The following with respect to the disallowance in the case of petitioner Byron H.

Farwell for the year 1953 is typical of the determination of the respondent as to each petitioner for each year (except that for the years 1954 and 1955 the references are to sections 611 and 613 and 162 and 212 of the Internal Revenue Code of 1954):

The amount of $8,095.56 included in the deduction claimed by you for depletion with respect to the oil and gas property located at Santa Fe Springs, California, has been disallowed for the reason that such amount does not represent a proper deduction to you under the provisions of sections 23(m) and 114(b) or any of the other provisions of the Internal Revenue Code of 1939.

It has been determined that the drilling and production expenses of $29,438.39, which you deducted in your return were incurred by the St. Anthony Oil Corporation and are not your expenses and are, therefore, not proper deductions by you under the provisions of section 23(a) or any of the other provisions of the Internal Revenue Code of 1939. An equivalent amount, or $29,438.39, which you included in gross income in your return and on which you computed and deducted depletion at 27½% thereof, was neither received by, nor owing to you, and is not a proper inclusion in your gross income for the purpose of computing your allowable depletion deduction and has accordingly been eliminated therefrom. * * *

The following tabulation summarizes the determinations of the respondent as to each petitioner for each year, with respect to the elimination from gross income of the drilling and production costs and disallowance of a portion of the depletion claimed:

| Year | Gross income reported | Drilling and production expenses eliminated from gross income | Amount subject to depletion | Depletion allowed | Depletion disallowed |
|---|---|---|---|---|---|
| Byron Farwell | | | | | |
| 1953 | $225,790.35 | $29,438.39 | $196,351.96 | $53,996.79 | $8,095.56 |
| 1954 | 197,007.91 | 24,527.13 | 172,480.78 | 47,432.21 | 6,744.96 |
| 1955 | 160,415.84 | 19,683.64 | 140,732.20 | 38,701.36 | 5,413.00 |
| Lyman Farwell | | | | | |
| 1953 | $225,790.36 | $29,438.39 | $196,351.97 | $53,996.79 | $8,095.56 |
| 1954 | 197,007.94 | 24,527.13 | 172,480.81 | 47,432.22 | 6,744.96 |
| 1955 | 160,420.85 | 19,688.60 | 140,732.25 | 38,701.36 | 5,414.37 |
| Felix Farwell | | | | | |
| 1953 | $225,790.33 | $29,438.39 | $196,351.94 | $53,996.79 | $8,095.56 |
| 1954 | 197,007.92 | 24,527.13 | 172,480.79 | 47,432.22 | 6,744.96 |
| 1955 | 160,415.82 | 19,683.61 | 140,732.21 | 38,701.36 | 5,412.99 |
| Ryan | | | | | |
| 1953 | $74,415.54 | $17,663.01 | $56,752.53 | $15,606.94 | $4,857.33 |
| 1954 | 64,928.14 | 14,716.26 | 50,211.88 | 13,808.27 | 4,046.97 |
| 1955 | 52,870.87 | 11,810.14 | 41,060.73 | 11,291.70 | 3,247.79 |
| Griswold | | | | | |
| 1953 | $49,611.61 | $11,775.35 | $37,836.26 | $10,404.97 | $3,238.22 |
| 1954 | 29,302.30 | 7,895.63 | 21,506.67 | 5,886.83 | 2,171.30 |

During the years in question the petitioners Byron, Lyman, and Felix Farwell and their mother jointly owned approximately 90 acres of real property in Santa Fe Springs, California. The property had been in their family for more than 50 years. The sons received a one-half interest therein by deed of gift in 1950.

The county real property tax bills covering such property described it by metes and bounds, and there was a discrepancy between the description of the property in the tax bills and that set forth in the deeds of record. In order to make sure that the tax bills covered all the property and no other and that their proper taxes were fully paid, Byron Farwell on behalf of himself and his brothers at some time in 1952 consulted an attorney and, on his advice, requested the Title Insurance & Trust Company of Los Angeles to make a map of all the land involved and check the tax bills against the map and deed. Thereafter, during the course of work by the title company, the brothers decided to obtain a policy of title insurance.

The title company made an investigation and reported to the attorney of the Farwell brothers that any discrepancies were probably immaterial. The total charge of the title company was $651.36, consisting of blueprinting, $1.36, services, $500, and premium for a $50,000 policy of title insurance, $150. Each of the Farwell brothers paid one-third of this amount in 1953.

The Farwell brothers were not at that time negotiating any lease or sale, and it was their intention to hold the property indefinitely.

Each of the Farwell brothers deducted one-third of the amount, or $217.12, in his income tax return for the year 1953. Byron included it among the $35,247.82 "other expenses" on the St. Anthony oil and gas lease, with the explanation that it was "Expense of Investigation & Report, including engineering boundary map, re current tax assessment, & Title Policy"; Felix included it among a total of $883.78 denominated "Survey and legal expenses—title policy" and deducted it from the income received from the St. Anthony lease; and Lyman included it among deductions taken against rental income other than the income from the St. Anthony lease calling it "Title Policy—Edison Lease."

The respondent in the notice of deficiency disallowed the claimed deduction in the case of each petitioner with the following statement:

The amount of $217.12 which you deducted in your return as representing the cost of a title policy provided in connection with the Edison lease has been disallowed as not representing a proper deduction under section 23(a) of the Internal Revenue Code of 1939. Such costs constitute capital expenditures the deduction of which are prohibited by section 24(a)(2) of the Internal Revenue Code of 1939.

The Farwell brothers owned certain improved real property in downtown Los Angeles which was subject to a lease. In 1952, they engaged the services of R. A. Rowan and Company to renegotiate the lease. For the services in renegotiating the lease they incurred a liability to R. A. Rowan and Company for a commission in the amount of $12,828.36. Each of them paid the sum of $2,276.12 in 1952 and deducted that amount in his 1952 income tax return. In 1953 each paid a balance of $2,000 and deducted that amount in his return for 1953.

Sometime after Felix Farwell filed his return for the year 1953, but before he filed his return for 1954, the respondent made an audit of his return for 1952, and disallowed the claimed deduction of $2,276.12 and allowed instead a deduction of an amortized portion, $47.50. At that time Felix agreed to the capitalization and amortization of the expenditure of $2,276.12 and the allowance of a deduction for 1952 of $47.50, and paid a resulting additional assessment for 1952.

In his joint return for 1954, Felix claimed as a deduction against rental income an amount of $2,228.62, designated therein as "Realtor's charges." This represented the portion of the 1952 payment of $2,276.12 which the petitioner had previously agreed should be disallowed as a deduction for that year.

The respondent, in the notice of deficiency, disallowed the $2,000 deduction claimed by Felix in his 1953 return, on the ground that it was not properly deductible under section 23(a), but was, rather, a nondeductible capital expenditure under section 24(a)(2) of the Internal Revenue Code of 1939. In such notice he also disallowed the deduction of $2,228.62 claimed by Felix in his return for 1954, stating that it represented a portion of a commission paid to a real estate broker in 1952 for securing a lease which was to commence in 1956, that it was not a proper deduction for 1954 under sections 162 and 212 of the Internal Revenue Code of 1954, and that it represented a nondeductible capital expenditure, as provided in section 263 of such Code. Therein the respondent also determined that the petitioners were liable for an addition to tax for the year 1954 in the amount of $342.77, pursuant to section 6653(a) of the Code "for negligence or intentional disregard of rules and regulations."

The joint income tax returns of the petitioners Felix Farwell and his wife, for the years 1952 and 1953, were prepared by a firm of accountants and bear the signature of a representative of the firm to a statement that such returns had been examined and were believed to be true and correct. The joint return for 1954 does not provide for such a signature, but in answer to a question on the face of the return, the petitioner represented that he had paid the same accounting firm for assistance in the preparation of the return.

OPINION.

The principal question presented is whether the petitioners are entitled to deductions for depletion, under sections 23(m) and 114(b)(3) of the Internal Revenue Code of 1939 [3] and sections 611(a) and 613(a) of the Internal Revenue Code of 1954, upon 25 per cent of the gross production under the lease, after payments of royalties and overriding royalties, as contended by them. This in turn depends upon whether the interest they retained was a gross profits, rather than a net profits, interest.

The petitioners obtained the working interest pursuant to the lease to them from Flora Farwell. On April 19, 1949, they entered into an agreement with St. Anthony assigning to it all their right, title, and interest in the lease, reserving an overriding royalty and "25 per cent of all oil, gas and other hydrocarbons produced on said land after second party makes the following deductions from all of said oil, gas, and other hydrocarbons." The deductions listed were the royalty to the original lessor, the overriding royalties, all taxes assessed against St. Anthony in its operations (except income and other general taxes), all drilling and development costs and operating expenses, and a sum for supervision and management equal to 5 per cent of all expenses. It was further specifically provided that in the event the petitioners took their oil, gas, and other hydrocarbons in kind, St. Anthony should deliver to them 25 per cent of the total quantity produced, after first deducting a quantity with a value equal to the value of the royalty oil and to the other deductions listed above.

We think there could hardly be a clearer statement of the reservation of a net profits interest without specifically denominating the interest reserved as a net profits interest. Under the language used, the petitioners retained an economic interest in the oil and gas in place only to the extent of the net amount to be received by them. See *Burton-Sutton Oil Co.* v. *Commissioner*, 328 U.S. 25, in which the grantee-operator was to pay the grantor 50 per cent of the proceeds of oil produced and sold after deducting from the proceeds certain itemized expenses of the producer. The Supreme Court there stated that the

---

[3] Section 23 of the Internal Revenue Code of 1939 provides:

"In computing net income there shall be allowed as deductions:

"(m) DEPLETION.—In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. * * * In the case of leases the deductions shall be equitably apportioned between the lessor and lessee. * * *"

Section 114(b)(3) of the Internal Revenue Code of 1939 provides:

"(3) PERCENTAGE DEPLETION FOR OIL AND GAS WELLS.—In the case of oil and gas wells the allowance for depletion under section 23(m) shall be 27½ per centum of the gross income from the property during the taxable year. * * *"

The corresponding provisions of the Internal Revenue Code of 1954 are substantially the same.

expenses were so general in character that it might be said fairly that the assignor was to receive 50 per cent of the net from operations.

The petitioners argue, however, that the negotiations of the parties and their subsequent conduct show that it was intended that the reservation should constitute 25 per cent of the gross production and that the reservation was in the nature of a "carried interest."

The petitioner Ryan, who is not a lawyer, but who is a petroleum and chemical engineer and who has had much experience in the practical business of representing owners of oil-producing properties, testified with respect to the negotiations leading up to the lease. The substance of his testimony was that in the discussions between himself and Woodward, who represented St. Anthony, it was contemplated that St. Anthony would assume the obligations of operating the lease; pay the landowner's royalty of 16⅔ per cent; pay the Farwell group an overriding royalty of 8⅓ per cent; divide the balance of the interest on the basis of 75 per cent to St. Anthony and 25 per cent to the Farwell group; and that St. Anthony was to advance the money for the development and production of the lease, and that the Farwell group's 25 per cent of the cost of development and production was to be charged against and collected from the Farwell group's 25 per cent of the oil produced and sold.

Ryan testified further, however, that he did not consider that the oral discussions constituted an oral agreement which was binding upon the parties. And the agreement which he drafted and which, with little or no change, was executed, states clearly that the interest reserved was an interest in the oil produced *after* St. Anthony made the specified deductions. It is well established that the tax consequences of a transaction are determined upon the basis of what was actually done rather than what might have been done. See *Television Industries, Inc.*, 32 T.C. 1297, 1302, affd. (C.A. 2) 284 F. 2d 322, and cases cited therein, and *Badger Oil Co.* v. *Commissioner*, (C.A. 5) 118 F. 2d 791, affirming 42 B.T.A. 521, certiorari denied 314 U.S. 634.

The petitioners allude to the fact that subsequently they objected to the inclusion by St. Anthony of certain amounts in computing the 5 per cent provided in the contract for supervision and management, and that as a result St. Anthony eliminated such charges. However, we do not consider this significant. This does not indicate that the 5 per cent was a charge made by St. Anthony for supervision and management on behalf of the Farwell group as joint operators. The provision for the 5 per cent deduction was, like the provisions for other expenses, one of the factors to be used in calculating the net interest retained by the Farwell group. Nor do we consider it significant that in making its reports to the Farwell group, St. Anthony used the term "participating" with respect to the interest of the petitioners.

Certainly the petitioners were participating whether their reserved interest was a gross profits or a net profits interest.

The petitioners have also referred to the provision of paragraph VI of the agreement to the effect that upon any termination of the rights of St. Anthony in the lease, the petitioners should be entitled to a credit of 25 per cent of the salvage value of all equipment and apparatus placed upon the land and removed therefrom by St. Anthony, to the extent paid for out of the proceeds of oil. From this the petitioners argue that throughout the operations they had an interest in such equipment and apparatus to the extent paid for out of 25 per cent of the oil, and that this indicates that the oil or equivalent used to pay for the equipment was theirs to the extent of 25 per cent. When considered in connection with the other terms of the agreement, we think this provision does not have that significance. We note that in the particular paragraph in question these improvements are referred to as its (St. Anthony's) improvements, and that St. Anthony was entitled to remove such improvements as its own. In addition, we note that the petitioners evidently did not consider that they had an ownership therein, since at no time did they, in their income tax returns, indicate that they were the owners and entitled to depreciation thereon.

The same question here presented was presented to us, upon similar facts, in *Marrs McLean*, 41 B.T.A. 565, affirmed on another issue (C.A. 5) 120 F. 2d 942, certiorari denied 314 U.S. 670. There the taxpayers assigned three-fourths of their interest, as lessees, in certain leases known as the Gray leases. They received a cash payment and the right to receive one-fourth of any profits from the operation by the assignee of the leased premises (excluding royalties due and fuel oil used), after deducting all expenses. The respondent allowed the taxpayers depletion equal to 27½ per cent of the amount the taxpayers actually received. The taxpayers contended that they were entitled to depletion of 27½ per cent of one-fourth of the gross proceeds from the sale of production by the assignee. We there held that the gross income of the taxpayers from the property for purposes of the depletion deduction is synonymous with gross income to be included in the return under section 22, and that this was limited to the net amount paid them.

The same conclusion was reached in *Commissioner* v. *Felix Oil Co.*, (C.A. 9) 144 F. 2d 276, affirming a Memorandum Opinion of this Court, in which the taxpayer, owner of land, executed a lease, but, instead of retaining a gross royalty, reserved the right to receive 50 per cent of the "net profits," the term "net profits" being defined as the proceeds of sale of the oil, less the expenses of the lessee, such as those for drilling, payment of taxes, and general operating costs. The tax-

payer there contended that it was entitled to depletion of 27½ per cent on one-half of the gross income from the property before deduction of the expenses paid by the lessee. The court there held that the lessor's "gross income from the property" was the net amount received. The fact that the *Felix Oil Co.* case involved a reservation by the owner of the land, rather than a reservation by a lessee-assignor, as in this case, is not a significant difference. *Burton-Sutton Oil Co., supra.*[4]

In support of their argument that they reserved a portion of the gross working interest in the nature of a "carried interest," rather than a net profits interest, the petitioners cite *J. S. Abercrombie Co.*, 7 T.C. 120, affd. (C.A. 5) 162 F. 2d 338; *Prater v. Commissioner*, (C.A. 5) 273 F. 2d 124, reversing 30 T.C. 1262; *Helvering v. Armstrong*, (C.A. 9) 69 F. 2d 370; and *Reynolds v. McMurray*, (C.A. 10) 60 F. 2d 843. All such cases are distinguishable. In the *Armstrong* and *McMurray* cases there did not purport to be any assignments to the operating company of any portion of the taxpayers' working interests in the leases. In the *Abercrombie* case, by the language used in the assignment, the assignors specifically purported to reserve to themselves a working interest in a portion of all the oil and gas leases. In the *Prater* case the language used in the assignment specifically purported to give the taxpayer an interest in the whole working interest under the leases, the taxpayer to pay interest on money advanced by the operator for development and operation of the leases.

We accordingly hold that the 25 per cent interest reserved by the petitioners was a net profits interest and that the respondent did not err, in computing their "gross income from the property," in excluding one-fourth of the drilling and production expenses.

On brief the petitioners contend that even if it be determined that their reserved interest is a net profits interest, their gross income from the property should properly include an amount equal to 25 per cent of the Los Angeles county mining rights and personal property taxes paid with reference to the St. Anthony lease, thereby permitting them to take depletion thereon, and that such taxes are deductible by them as such under section 164 of the Internal Revenue Code of 1954 and its 1939 Code counterpart. They cite Revenue Ruling 16, 1953–1 C.B. 173, G.C.M. 26526, 1950–2 C.B. 40, and Revenue Ruling 54–600, 1954–2 C.B. 164.

The cited rulings hold that where a mineral or oil and gas lease provides that the lessee shall pay ad valorem property taxes imposed upon the lessor, such payments made after the commencement of production connote a depletable economic interest in the lessor and

---

[4] The Supreme Court there stated that "Whether the instrument creating the rights is a lease, a sublease or an assignment has not been deemed significant from the federal tax viewpoint in determining whether or not the taxpayer had an economic interest in the oil in place."

are to be included in the lessor's depletable gross income and not that of the lessee; also that such taxes are deductible, as such, from gross income by the lessor.

The respondent takes the position that while those rulings support the right of the original lessor to include in gross income her share of ad valorem taxes, deduct the same, and compute depletion thereon, they do not establish the petitioners' right to do so. His position seems to be that since, under the agreement, St. Anthony relieved the petitioners from liability to third persons arising from operations, the petitioners are precluded from including in their gross income any amounts on account of taxes paid by St. Anthony.

It has been stipulated that over the 3 years in question St. Anthony paid a total of ad valorem mining rights taxes of $203,452.70 and a total of ad valorem property taxes of $22,475.46. However, neither party has cited us a reference to the statutes imposing these taxes, and neither has attempted to show whether, or the extent to which, such taxes were imposed upon the petitioners. Under the circumstances we are unable to reach a conclusion as to whether the principle of those rulings would be applicable in the instant case. However, we think it pertinent to point out that apparently the respondent, in his determinations, did allow the petitioners to take depletion upon some mining rights taxes paid by St. Anthony. As will be noted from our Findings of Fact, the petitioners in their returns reported gross profits from production, rather than net profits, and deducted expenditures made by St. Anthony for taxes as well as drilling and production. The only portion which the respondent excluded from their reported gross income for the purpose of computation of the depletion deductions were the drilling and production costs, thus leaving in the gross income from the property the amounts paid by St. Anthony for mining rights taxes. For example, the gross income of $225,790.36 from the lease reported by the petitioners Lyman H. and Catherine Farwell for 1953 included expenditures made by St. Anthony for production and drilling in the amount of $29,438.39, and mining rights tax of $4,609.45. From the gross income so reported, the respondent disallowed only the production and drilling expenses of $29,438.39. Thus for all we know from this record, the respondent may have included in the petitioners' basis for depletion all taxes which St. Anthony may have paid on their behalf, and also allowed the petitioners to deduct such taxes. It should be added that although on brief the respondent argues that the petitioners are not entitled to any depletion based upon any taxes paid by St. Anthony, he has not affirmatively pleaded that his determination was in error. Under the circumstances, we see no reason for disturbing the respondent's determinations.

The petitioners also argue that an amount equal to the 5 per cent charge for supervision and management should also be included in their gross income for depletion purposes. We see no basis whatever for this contention. The 5 per cent provided for supervision and management was merely one of the items listed in the assignment to be taken into consideration in calculating the net amount to which the petitioners were entitled. It did not to any extent represent a liability of the petitioners to any third parties which St. Anthony paid on their behalf.

The next question is whether each of the Farwell brothers is entitled to a deduction of $217.12 for the year 1953, representing the share which he paid to a title insurance company. The respondent disallowed this claimed deduction on the ground that the full amount was the cost of a title insurance policy in connection with an "Edison lease." The evidence shows, however, that this charge had to do with the property in Santa Fe Springs, which was already under lease to St. Anthony. The three brothers had received in 1950 a one-half interest in the fee to such property by deed of gift from their mother. We are satisfied from the evidence that the greater portion of the total amount paid to the title insurance company, namely, $501.36, was for services rendered by the title company in connection with the investigation by the Farwell brothers to determine whether local taxes were being paid on the property in which they had an interest and whether they were paying taxes on property which did not belong to them. As such we think that to this extent the expenditure constituted ordinary and necessary expense paid for the management, conservation, or maintenance of property held by them for the production of income within the meaning of section 23 (a) (2) of the Internal Revenue Code of 1939.[5] The expenditure to this extent did not result in the acquisition of any asset. The remainder of the amount paid to the title insurance company, namely, $150, however, was for a title insurance policy in the face amount of $50,000. In our opinion the expenditure to this extent is in the nature of a capital expenditure and is not deductible in 1953 as an ordinary and necessary expense. Congress in enacting section 23 (a) (2) did not intend to expand the type of expenditures which had theretofore been deductible, except for eliminating the

---

[5] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

(a) EXPENSES.—

\* \* \* \* \* \* \*

(2) NON-TRADE OR NON-BUSINESS EXPENSES.—In the case of an individual, all the ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income.

Section 39.23(a)–15(k) of Regulations 118 provides in part:

If property is held by an individual for the production of income, amounts expended in determining a property tax imposed with respect to such property during the period when so held are deductible. \* \* \*

requirement that they be incurred in a trade or business. Thus, it was not the intention of Congress to remove other restrictions and limitations applicable to deductions under section 23(a); thus, capital expenditures or expenditures in the nature of capital expenditures remained nondeductible. See *Bowers* v. *Lumpkin*, (C.A. 4) 140 F. 2d 927, and S. Rept. No. 1631, 77th Cong., 2d Sess., p. 88, and H. Rept. No. 2333, 77th Cong., 2d Sess., p. 75, which set forth the purpose of Congress in enacting section 121(a) of the Revenue Act of 1942, which added section 23(a) (2) to the Internal Revenue Code of 1939. The benefits of the insurance policy which the petitioners acquired extended for an indefinite period beyond the year in question and if deductible at all would be deductible on an amortized basis. But here even if the amount expended for the policy were considered as the cost of an asset representing prepayment of expenses (cf. *Martha R. Peters*, 4 T.C. 1236, and cases cited therein), no deduction would be allowable for the year in question, since, the contract being for an indefinite period, there is no basis upon which amortization can be computed. We think the respondent was correct in disallowing the deduction claimed by each petitioner to the extent of the $50 paid by each for the title insurance policy.

In their joint return for 1953 the petitioners Felix Farwell and his wife claimed a deduction in the amount of $2,000, representing the amount paid by them in that year, as lessors, to a real estate broker for renegotiation of a lease on a building. In their return for 1954 they claimed an amount of $2,228.62, representing a portion of the amount paid by them in 1952 for the same purpose. In their petition they did not question the respondent's disallowance of the claimed deduction for 1954, but did raise the issue of the disallowance of the deduction claimed for 1953. They also raised the issue, alternatively, as to whether some portion of the total of the expenditures made should be allocated to 1953 and 1954 and allowed as deductions. On brief they concede that the claimed deductions for 1953 and 1954 were properly disallowed, evidently upon the ground that the expenditures constituted cost of the renegotiated lease and hence capital expenditures, and no contention is made on brief that they are entitled to deduct any portion of the expenditures for the years 1953 and 1954. Accordingly, we assume that they have abandoned this issue entirely. In any event, we think they are not entitled to any deduction in either year. The respondent held that the payments were made for securing a lease which was to commence in 1956, and there is no evidence to the contrary. We see no reason for amortizing the cost of a lease over years prior to the year it goes into effect.

The petitioners Felix Farwell and his wife contend that the respondent erred in determining that they are liable for an addition

to tax for 1954 under section 6653(a) of the Internal Revenue Code of 1954.[6] Any underpayment of tax by them for the year 1954 was, of course, due in part to their deduction of the amount of $2,228.62.

This amount of $2,228.62 which the petitioners deducted in their return for 1954 was not paid by them in 1954. This is the portion of the amount, paid by Felix in 1952 for renegotiation of the lease, which the respondent had disallowed as a deduction for 1952. The respondent had taken the position with respect to the deduction claimed for 1952 that the expenditure was not deductible in full in that year, but that it should be amortized and deducted over a number of years. Felix had apparently had some discussions with the respondent's representatives, because he testified that he had agreed to this treatment of the expenditure, and he paid an additional tax for that year. His testimony, as well as the stipulation of facts, shows that all this transpired before he filed his return for 1954. Aside, however, from the question whether the full amount was deductible in the year paid or properly should be amortized, the fact remains that Felix knew, of course, that he did not expend this amount in the year 1954. One of the basic principles or rules of income taxation is that on the cash method of accounting and reporting income, expenditures are not taken as deductions for a year other than the year in which expended, except as they may properly be amortizable. This, we believe, is generally known by businessmen, and it would seem probable that Felix was aware of this principle. In any event, there is no evidence to show that he did not have this knowledge.

Felix testified that his reason for claiming the deduction for 1954 was that he was aware that his two brothers had taken similar deductions in 1952 and 1953 and that such deductions had not been disallowed, that he was simply trying to assure himself of obtaining at some time the deduction to which he thought he was entitled, and that he feared that he might lose the deduction by failure in the future to remember the amortizations. He said that he talked to an accountant of the accounting firm which had prepared his returns for 1952 and 1953, told such accountant that his brothers had taken these commissions as deductions in 1952 and 1953 and they had not been disallowed, and that he also told the accountant that since he did not know whether or not the agent had made a mistake, he would leave the matter in the hands of the accountant. It is difficult to believe that the accountant would have advised the deduction of this amount in toto for 1954, if he

---

[6] Section 6653(a) provides:

If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 per cent of the underpayment.

knew all the facts involved, as he may have, since the firm prepared the returns for 1952 and 1953. Rather, one would expect that the advice would be that, at most, any deduction for 1954 would be an amortized portion of the expenditure. No member of the accounting firm testified, and there is no evidence as to the advice given by the accountant. Nor has it been made clear whether the accountant actually prepared and filed the return for 1954.

The petitioners state that the claimed deduction was not "hidden" in their return; and respondent does not contend that it was. However, we do not think this is determinative. The resultant underpayment might still be due to negligence or intentional disregard of rules and regulations. See *American Properties, Inc.*, 28 T.C. 1100, affd. (C.A. 9) 262 F. 2d 150, and cases cited therein.

The burden of proof is upon the petitioners to show that the respondent was in error in determining the addition to tax. See *David Courtney*, 28 T.C. 658, and cases cited therein. On this record we cannot conclude that the petitioners have met their burden of showing that the respondent was in error in determining that some part of the underpayment of tax by Felix and Margaret Farwell for the year 1954 is due to negligence or intentional disregard of rules and regulations within the meaning of section 6653(a), and in determining an addition to tax pursuant to that section.

The amount of deductible medical expenses to which the petitioners Byron H. Farwell and Martha Allan Farwell are entitled for the year 1955 will be determined in connection with the recomputation under Rule 50.

*Decisions will be entered under Rule 50.*