Norman W. Meyers v. Commissioner.
Meyers v. Commissioner
Docket No. 3151-67.
United States Tax Court
T.C. Memo 1968-289; 1968 Tax Ct. Memo LEXIS 11; 27 T.C.M. (CCH) 1535; T.C.M. (RIA) 68289; December 18, 1968, Filed *11 Norman W. Meyers, pro se, 30 S. Carlisle St., Allentown, Pa. Edward L. Newberger, for the respondent. FEATHERSTON
Memorandum Findings of Fact and Opinion FEATHERSTON, Judge: Respondent determined deficiencies in petitioner's Federal income tax, and additions to tax under section 6653(a), [1] for the taxable years 1962 and 1963 as follows: Year
Deficiency
Addition to Tax
1962
$8,842.51
$442.13
1963
3,123.72
156.19
The issues for decision are: (1) Whether petitioner realized income in 1962 as a result of the forgiveness of indebtedness of $15,000 to one John Parenti; (2) Whether petitioner incorrectly set forth on his Federal income tax returns the opening and closing inventory for 1962, and the opening inventory for 1963; (3) Whether petitioner understated gross receipts from his business in 1962 and 1963; 1536 (4) Whether certain expenses deducted by petitioner from his reported business income in 1962 and 1963 were personal expenses and, if so, in what amounts; (5) Whether $2,770.10 received by petitioner in 1963 from the Lehigh County Prothonotary constituted taxable income or partial repayment *12 of a loan made by petitioner; and (6) Whether additions to tax for negligence under section 6653(a) were correctly determined for 1962 and 1963. These issues, all factual in nature, arise mainly from adjustments proposed by respondent's agent following an examination of petitioner's returns for 1962 and 1963. Upon the failure of petitioner to furnish requested data to substantiate his treatment of the disputed items, a notice of deficiency was issued adopting most, if not all, of the proposed adjustments. Our problem, principally, is to decide whether the evidence presented at the trial is sufficient to refute respondent's determinations. General Findings of Fact Petitioner Norman W. Meyers was a legal resident of Allentown, Pennsylvania, when his petition was filed. He filed Federal income tax returns for the taxable years 1962 and 1963 with the district director of internal revenue at Philadelphia, Pennsylvania. Issue 1: Forgiveness of Indcbtedness Findings of Fact For several years prior to 1962 petitioner was employed as a salesman by John Parenti, who owned and operated Market Motors, a used car business in Allentown, Pennsylvania. Since Parenti, a close family friend, was unable *13 in 1962 to renew his lease on the business premises occupied by Market Motors, he transferred the assets of the business to petitioner on July 10, 1962. These assets consisted of the office furniture and six automobiles, most of which were in need of repair. Simultaneously with the transfer of these assets, title to a Cessna Model 172 airplane, which cost $10,800 in 1960 and was registered in the name of Market Motors, was also transferred to petitioner. Under date of July 10, 1962, petitioner signed a "Bill of Sale" which recited that the assets of Market Motors, including only the "used cars * * *, office furniture, furnishings and any other improvements," were to be transferred to him in consideration of $15,000. No payments were made under this sales contract in 1962. Respondent determined that petitioner acquired the assets of Market Motors for $15,000 in 1962. Respondent allocated part of the "purchase price" to the six automobiles and office furniture and the balance to the airplane. Respondent further determined that the petitioner's $15,000 debt arising from the "purchase" was forgiven by Parenti in 1962 with the result that petitioner realized taxable income in that amount. *14 Petitioner had no communication, written or oral, with Parenti in 1962 regarding the forgiveness of any indebtedness that may have arisen as a result of the acquisition of Market Motors' assets. If any such indebtedness did arise in 1962, it was not forgiven in that year. Opinion Petitioner's principal contention is that Parenti made him a gift of the Market Motors assets, consisting mainly of the six old automobiles needing repair, and that he, petitioner, had bought and paid for the airplane in 1960, taking title thereto in the name of Market Motors to avoid paying the Pennsylvania sales tax at that time. To substantiate his purchase of the airplane for his own account in 1960, petitioner introduced a receipt for payment of the purchase price, dated April 25, 1960, which indicated that he was the payor. He testified that he signed the "Bill of Sale" transferring the Market Motors assets at Parenti's request for the latter's "books." Without passing on the merits of petitioner's contention that the $15,000 sales contract was without substance, we hold that in any event, no forgiveness of indebtedness to Parenti occurred in 1962. Cf. sec. 1.61-12, Income Tax Regs. Petitioner testified, *15 truthfully we believe, that he had no communication, oral or written, with Parenti in 1962 relating to the forgiveness of any such indebtedness. There is no evidence of record to the contrary, and respondent suggests no reason why Parenti would exact a debt obligation of $15,000 from petitioner in July 1962 and then forgive the debt before the end of the year. We do not think Parenti did so. 1537 Issue 2: Inventory Findings of Fact In his Federal income tax return for 1962 petitioner claimed an opening inventory (as of July 10, 1962, the date of his acquisition of the business) of $20,000.58. Respondent's agent examined petitioner's inventory ledger sheets and determined that on the basis of cost of the automobiles to Parenti (the former owner of Market Motors) the opening inventory should have been $4,155.63: 1953
Pontiac
$ 156.92
1957
Oldsmobile
295.00
1951
Dodge
95.00
1956
Plymouth
721.20
1955
Ford
587.51
1959
Lincoln 2,300.00
$4,155.63
Petitioner agreed at the trial that the July 10, 1962, inventory was overstated in his return. Petitioner's records disclosed purchases of inventory in 1962 of $12,203, but he did not report any such expenditures in his 1962 return. Respondent allowed petitioner *16 credit for purchases in 1962 in the amount of $12,203. The closing inventory for 1962 was determined by respondent to be $8,064.12 rather than the $7,955.71 shown on the return. Respondent's determinations are reflected in the following adjustment: Overstatement of opening in- ventory
[2] $15,844.85
Understatement of closing in- ventory 108.41
$15,953.26
Offsetting this adjustment is the allowance by respondent of $12,203 for inventory purchases in 1962. For 1963 the opening inventory was adjusted by respondent to reflect the closing inventory as of December 31, 1962. The adjustment of $108.41 reduced the petitioner's income by that amount in 1963. Opinion Petitioner conceded that he overstated his opening inventory in 1962 but offered no substantial evidence from which we could compute a more accurate figure than respondent's determinations. Petitioner argues that respondent's determinations are inaccurate, but his vague testimony and his cross-examination of the revenue agent with respect to the July 10, 1962, values of the automobiles acquired from Parenti appear *17 to have been directed toward establishing even lower values than those determined by respondent. We sustain respondent's determinations as to opening and closing inventory for both years. Issue 3: Gross Receipts Findings of Fact Respondent's agent found that the books and records maintained by petitioner were incomplete and inadequate. Petitioner did not employ a bookkeeper or accountant but used check stubs as records and attempted to utilize as models the work sheets of the accountant whom Parenti had employed for Market Motors. The agent, therefore, reconstructed petitioner's gross receipts for 1962 and 1963 by means of bank deposits analyses, as follows: [3]
[Table of Bank Deposits on Page 1538.] As noted above, the revenue agent's determination of gross deposits for 1962 was adjusted to account for the deposit of a loan of $11,000 from Parenti. He did not make adjustments for two other deposits which did not represent business income: $1,000 deposited on July 19, 1962, and $1,000 deposited on July 30, 1962. The July 19 deposit represented funds advanced to petitioner by Parenti to pay bills that arose *18 from Market Motors when it was owned by Parenti - employment tax, city income tax, and the like. The deposit on July 30 came from petitioner's savings and was used to purchase the first addition to his inventory. These sums were deposited prior to petitioner's making any sales as owner of the business. The agent concluded that the personal expenses paid by business checks did not include any amounts for food or clothing for petitioner or his mother, who received 60 percent of her support from petitioner. He decided that $1,200 a year was a reasonable estimate of these expenditures. Since petitioner had no net receipts from any source other than Market Motors, the agent therefore concluded that the expenditures for food and clothing were paid for by cash withdrawals from Market Motors, and accordingly added $1,200 per year to petitioner's gross business receipts. However, the amount of cash withdrawn from the business receipts to purchase food and 1539 clothing totaled only $600 in 1962 rather than $1,200 as determined by respondent's agent. The $11,200 addition to gross receipts for 1963, designated as "Capital Items Purchased (Alpine Furniture and Fixtures)," represented a purchase *19 by petitioner at a sheriff's sale on February 11, 1963. Alpine Villa, Inc., had leased premises in Allentown for the operation of a restaurant. In 1962, it became delinquent in the payment of its rent and taxes. The lessor gave notice of the termination of the lease effective December 31, 1962, and on January 29, 1963, obtained a judgment for the delinquent rent and taxes. On February 11, 1963, some of Alpine Villa, Inc.'s assets were sold to satisfy the judgment, and petitioner bid them in at the sheriff's sale for $11,200, paying the full amount in cash. However, petitioner did not act in his own behalf, but only as nominee for another; the cash paid belonged to his principal, not to him. Accordingly, the $11,200 did not represent gross receipts of petitioner's operations in 1963 and was not, otherwise, taxable income to him. Bank Deposits Analysis 1962
(1) Deposits
$30,723.12
Less: Deposit of Loan from John Parenti 11,000.00
Net Deposits Resulting from Business
$19,723.12
(2) Total Business Expenses per 1962 Return, adjusted upward for inventory expenditures not shown on return
$15,196.35
(3) Computation of Business Checks for Year Opening Balance
0
Add: Deposits $30,723.12
Total
$30,723.12
Less: Closing Balance 175.89
Total Checks Written
* *20 $29,547.23
Less: Repayment of Parenti loan 10,000.00
Difference
* $19,547.23
Less: Business Expenses (Above) 15,196.35
Personal Living Expenses Paid by Business Checks
* $ 4,350.88
* $ 4,350.88
(4) Total Business Expenses Paid by Cash
None
(5) Add: Estimated Living Expenses Paid By Cash Withdrawals from Business $ 1,200.00
(6) Gross Receipts as Determined
$20,923.12
Less: Gross Receipts as Shown by 1962 Return 14,187.00
Understatement of Income 1962 $ 6, 736.12 Bank Deposits Analysis 1963
(1) Deposits
$30,259.21
Less: Nontaxable Cash Deposits
(A) Repayment of Loans to 3d Parties
$ 2,590.00
(B) Proceeds Received from Sheriff's Office
1,666.66 4,256.66
Net Deposits Resulting from Business
$26,002.55
(2) Total Business Expenses per 1963 Return
$28,175.22
(3) Computation of Business Checks for Year Opening Balance
$ 175.89
Add: Deposits 30,259.21
Total
$30,435.10
Less: Closing Balance 263.83
Total Checks Written
$30,171.37
Less: Non-Business Checks (A) Loans to 3d Parties
$ 2,590.00
(B) Personal Living Expenses Paid by Business Checks (as determined from canceled checks) 3,339.33
Total Business Expenses Paid by Checks
$24,242.04
(4) Total Business Expenses (Above)
28,175.22
Less: Paid by Checks
24,242.04
Total Business Expenses Paid by Cash
$ 3,933.18
(5) Add:
(A) Capital Items Purchased (Alpine Furniture and Fixtures)
$11,200.000
(B) Estimated Living Expenses Paid by Cash Withdrawals from Business
1,200.00 $12,400.00
Total Expenditures
$42,335.73
Less: Nontaxable Cash Used to Pay Expenses (auto purchased out of escrow account - Fogelsville Nat'l.) 321.74
(6) Gross Receipts as Determined
$42,013.99
Less: Gross Receipts as Shown by 1963 Return $26,320.00
Understatement of Income 1963 $15,693.99
Opinion *21 Petitioner has shown three errors in the revenue agent's analysis of his gross receipts from Market Motors; otherwise, the analysis is sustained for both years. First, petitioner has shown that adjustments should have been made by the agent for two bank deposits: one in the amount of $1,000 on July 19, 1962, and the other for an equal amount on July 30, 1962. The $1,000 deposited on July 19, 1962, was given to petitioner by Parenti to cover certain liabilities relating to the period when the latter owned the business. Indeed, check stubs confirm that petitioner made payments covering liabilities for such period. The other deposit represented moneys invested in the business by petitioner from past savings. Our findings as to these two deposits are corroborated by the agent's admission that both of them preceded any sales by petitioner after taking over the business. Second, the agent's addition to the 1962 gross receipts of $1,200 for personal expenses paid with cash withdrawals from the business is excessive. Petitioner admits that most of his expenditures for food for himself and his mother were made by cash and that $1,200 a year is a reasonable estimate of such expenditures. We *22 note, however, that petitioner did not acquire the Market Motors business until July 10, 1962. We cannot assume, as did the agent, that the cash withdrawals used to pay personal expenses during 1962, when petitioner owned the business only for approximately onehalf of the year, equaled the withdrawals made for that purpose during 1963, when petitioner owned the business for the full year. The cash used for personal expenses prior to July 10, 1962, must have come from sources other than the receipts from Market Motors. Accordingly, the gross receipts for 1962 should be reduced by one-half of the $1,200 amount determined by the agent, $600, to adjust for this excessive charge for living costs. Third, careful weighing of all the evidence convinces us that the $11,200 cash paid in at the sheriff's sale did not belong to petitioner. The parties agree that petitioner had no source of income in 1962 and 1963 other than the struggling second-hand automobile business; indeed, this is the premise on which respondent proceeded in determining that petitioner's gross business receipts were the source of his personal living expenses. Respondent's agent was able to trace each automobile purchase *23 and sale on petitioner's records, confusing and inadequate though they may have been. The only sale omitted from these records was one made to petitioner's brother on November 9, 1963. These facts render it highly unlikely that the $11,200 was derived from petitioner's business operations in 1963. Moreover, respondent offered no evidence to refute petitioner's testimony that the $11,200 did not represent business receipts but belonged to another for whom petitioner was acting in bidding in the furniture and fixtures. Petitioner explained, truthfully we believe, that he served as nominee (or "straw man") for an individual who owned a brewery and, for this reason, could not have legally acquired the liquor license used by Alpine Villa, Inc., in the operation of the restaurant. While the record is obviously not as complete as it might have been, we think it sufficient to show that the $11,200 was not income to petitioner in 1963. In summary, we hold that petitioner's gross receipts from Market Motors as determined by respondent should be reduced by $2,000 of non-income deposits in 1962; by $600 of personal expenses paid by cash from sources other than the business in 1962; and by the *24 $11,200 paid in at the sheriff's sale of Alpine Villa, Inc.'s furniture and fixtures in 1963. Issue 4: Disallowed Expenses Findings of Fact Petitioner claimed deductions in his returns for 1962 and 1963 for the cost of 1540 telephone service and electricity furnished at his residence, hangar storage for an airplane, and gas and oil for his automobile. The home telephone and electricity expenses were not separately itemized on petitioner's returns but were included in the claimed expenses of Market Motors for similar items; the car expenses were included in his business expenses under the heading of gas, oil, and road delivery costs. The cost of renting the hangar was listed as storage rental. Respondent determined that the abovementioned expenses were personal and accordingly disallowed the deductions claimed for them in the following amounts: 1962
1963
Home Telephone
$ 48.00
$106.04
Home Electricity
53.85
105.09
Hangar Storage
230.80
280.00
Gas and Oil[for personal automobile] 162.00
158.25
Total
$494.65
$649.38
Petitioner has failed to show that these disallowed items were deductible business expenses. Opinion As to all of these disputed deductions, petitioner failed to show that the expenditures *25 were ordinary and necessary business expenses within the meaning of section 162. Although petitioner did use his residence to some extent for business purposes, as evidenced by the fact that he made and received some business telephone calls there, he did not show the extent of his business use of his home or any other basis for allocating his home expenses between business and personal use. Similarly, he offered no evidence at all regarding his use of the airplane and the automobile for business purposes during the taxable years before us. In view of this complete failure of proof, we must sustain respondent's disallowance of the claimed deductions. Issue 5: Lehigh County Prothonotary Payment Findings of Fact Petitioner loaned $4,500 to Alpine Villa, Inc. (hereinafter "Alpine"), on March 1, 1961. On the same date the president and secretary of Alpine issued to petitioner a six-month, 6-percent demand note in the amount of $4,500; this note was reflected in Alpine's books and records. Alpine later became insolvent, and following a sheriff's liquidation sale petitioner received $2,770.10 from the Lehigh County Prothonotary in 1963. The $2,770.10 received by petitioner represented partial *26 repayment of the loan petitioner made to Alpine in March 1961. Respondent determined that there should be included in petitioner's taxable income for 1963 the $2,770.10 which he received from the Lehigh County Prothonotary. Opinion Petitioner testified unequivocally that he loaned $4,500 to Alpine on March 1, 1961, and that the $2,770.10 received from the Prothonotary in 1963 was his share of the proceeds from the liquidation of Alpine's assets in an insolvency proceeding. Petitioner buttressed his testimony by introducing a note, dated March 1, 1961, and signed by the president and secretary of Alpine, together with evidence that the liability on the note was reflected in the books and records of Alpine. Respondent offered no evidence to establish that the $2,770.10 was taxable income except some vague testimony of an alleged admission by petitioner that he made no loan to Alpine. We are convinced from our careful consideration of the entire record on this issue that the $2,770.10 received by petitioner in 1963 was not taxable income but represented partial repayment of a loan made by petitioner to Alpine in 1961. [4] *27 Issue 6: Addition to Tax for Negligence Findings of Fact Petitioner did not maintain formal books and records of his operation of Market Motors but kept stubs, with notations thereon, of checks drawn on his business bank account and maintained work sheets on which he recorded purchases and sales of automobiles. His bank account, maintained with the First National Bank of Allentown, Pennsylvania, was used for the payment of personal, as well as business, expenses. The check stubs did not reflect cash withdrawals from the business to cover his expenditures for food and clothing. Nor did the check stubs clearly differentiate between checks drawn to pay home and office utility bills with the result that deductions were 1541 erroneously claimed on his 1962 and 1963 returns for personal as well as business utility expenses. (See Issue 4 above.) Petitioner's 1962 return substantially overstated opening inventory and did not reflect any inventory purchases during the year. (See Issue 2 above.) Petitioner's records did not show the sale of an automobile *28 in 1963 to his brother, Carl Meyers, for $2,719.63. Petitioner's underpayments of income taxes for 1962 and 1963 were attributable to his negligence in keeping his business records and preparing his returns. Respondent determined that petitioner was liable, pursuant to section 6653(a), for an addition to tax in the amount of $442.13 for 1962 and $156.19 for 1963 for negligence or intentional disregard of rules and regulations. Opinion To avoid the addition to tax under section 6653(a), [5] *29 petitioner must show that no part of any underpayment of income taxes was due to his negligence or intentional disregard of respondent's rules and regulations in making out his tax return. Marcello v. Commissioner, 380 F. 2d 494, 505-507 (C.A. 5, 1967), affirming in part a Memorandum Opinion of this Court; Byron H. Farwell, 35 T.C. 454, 473 (1960). Petitioner has completely failed to carry his burden of proof on this issue. Petitioner's records were wholly inadequate for a business generating sales of some $30,000 per annum and incurring commensurate expenses. As a direct result of his failure to keep adequate records, his returns for both 1962 and 1963 were inaccurate in several respects: (1) The opening inventory shown on his 1962 return was excessive; (2) cash withdrawals from the business to pay personal expenses were claimed as deductions; (3) expenditures for home utilities were claimed as deductions; and (4) the proceeds of the sale of the automobile to his brother in 1963 were omitted. See Thomas J. Avery, 11 B.T.A. 958, 962 (1928). These inaccuracies in petitioner's records, resulting in underpayments, are affirmative evidence of negligence on the part of petitioner in making his returns for 1962 and 1963. See Barry Meneguzzo, 43 T.C. 824 (1965). The addition to tax under section 6653(a) is sustained for both years, 1962 and 1963. Decision will be entered under Rule 50. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.↩
2. This was the figure contained in the statutory notice; however, the difference between $20,000.58 and $4,155.63 is $15,844.95.↩
3. The explanations accompanying some entries in the analyses have been expanded.↩
*. These are the figures contained in the agent's analysis; each should be increased $1,000.
4. Petitioner does not allege or otherwise claim that he is entitled to a nonbusiness bad debt loss for the unpaid portion of this indebtedness. See sec. 166(d). Accordingly, we do not here consider this question.
5. SEC. 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations With Respect to Income or Gift Taxes. - If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.