STEVENS PASS, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 141–66. Filed June 30, 1967.

*Loren D. Prescott*, for the petitioner.

*Norman H. McNeil*, for the respondent.

FAY, *Judge:* Respondent determined deficiencies in petitioner's Federal income tax for the fiscal years ended September 30, 1961, 1962, 1963, and 1964, in the amounts of $25,897.89, $38,566.82, $43,900.82, and $28,055.33, respectively.

The parties have stipulated as to certain items raised in the statutory notice of deficiency so that the issues remaining for determination are as follows:

(1) Whether, upon the liquidation of its subsidiary, petitioner was entitled to the step-up in the basis of depreciable assets pursuant to section 334(b)(2) of the Internal Revenue Code of 1954.[1]

(2) In the event petitioner is entitled to the benefit of section 334(b)(2), whether the amount allocated by it to the tram equipment is reasonable.

(3) Whether respondent's determination of the useful life of No. 3 ski lift is proper.

### FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulation of facts, together with the exhibits attached thereto, is hereby incorporated by this reference.

Petitioner, Stevens Pass, Inc., is a Washington corporation which was organized on September 29, 1960. Its principal office at the date of filing the petition was located at Stevens Pass, Wash. Since December 1, 1960, petitioner has operated the ski area at Stevens Pass. Petitioner, an accrual basis taxpayer, computed its income on the basis of a fiscal year ending September 30. Its Federal corporation tax returns for the fiscal years ending September 30, 1961, 1962, 1963, and

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954.

1964, were filed with the district director of internal revenue at Tacoma, Wash.

Petitioner is the survivor by merger, under the laws of the State of Washington, with Stevens Pass Co., Inc. (hereinafter referred to as the old company), on December 1, 1960.

The old company was organized in 1946 to operate the ski facilities and area at Stevens Pass, Wash. In 1960 the authorized capital of the old company consisted of 100 shares of class A voting common stock and 33⅓ shares of class B nonvoting common stock. The class A and class B stocks share in the earnings and capital on the basis of two-thirds to class A and one-third to class B. The total authorized and issued shares of the old company on November 30, 1960, were owned as follows:

| Name | Class A | Class B |
| --- | --- | --- |
| Donald G. Adams [1] | 50 | 0 |
| Bruce Kehr [1] | 50 | 0 |
| John H. Caley | 0 | 33⅓ |

[1] By agreements dated June 16, 1948, and Sept. 15, 1948, between Adams and Kehr, Adams had 51-percent voting control of the old company.

Sometime during the spring of 1960 an irreparable dispute arose between Donald G. Adams (hereinafter referred to as Adams) and Bruce Kehr (hereinafter referred to as Kehr). It was determined that the dispute could not be settled unless one or the other sold his stock in the old company. However, no agreement was reached that was satisfactory to both parties. Thereafter, Adams, Kehr, and John H. Caley (hereinafter referred to as Caley) attempted to interest outside investors in acquiring stock in a new corporation to be formed to acquire the stock of the old company and then to dissolve it.

On June 10, 1960, Adams, Kehr, and Caley offered to sell all of their shares in the old company to Loren D. Prescott, an agent for undisclosed principals, for the sum of $650,000. Contemporaneously with the execution of the offer to sell, they executed an agreement among themselves concerning the division of the $650,000 sales proceeds as follows: Adams, $250,000; Kehr, $200,000; and Caley, $200,000. This latter agreement also called for the transfer by Kehr of his stock (33⅓ shares) in a corporation known as Trans, Inc., to Adams for the sum of $4,800.

On or about June 30, 1960, a prospectus relevant to the financial condition of the old company was prepared and circulated to various potential investors. The prospectus proposed that a new company (petitioner) be formed to purchase all the shares of the old company and then dissolve it.

On September 2, 1960, a subscription account was set up for investment in petitioner. The subscribers, amount subscribed, and date subscribed were as follows:

| Date | Name | Units subscribed [1] |
|---|---|---|
| Aug. 30, 1960 | Melvin R. Whitman | 4 |
| Sept. 1, 1960 | Mel S. Johnston | 3 |
| Sept. 6, 1960 | Donald P. Christianson | 4 |
| Sept. 8, 1960 | Miles W. Tippery | 4 |
| Sept. 27, 1960 | John M. Shiach | 1⅓ |
| Sept. 27, 1960 | Bernard J. Goiney | 1⅓ |
| Sept. 27, 1960 | Homer V. Hartzell | 1⅓ |
| Oct. 13, 1960 | Reider Tanner | 1 |
| Nov. 2, 1960 | Vernon O. Lundmark | 1 |
| | | 21 |

[1] A unit consisted of 10 shares of no-par common stock at $250 per share and one $2,500, 20-year, 6-percent ebenture at par for a total investment of $5,000.

The subscribers deposited 10 percent of the subscription price into escrow at a bank located in Seattle, Wash.

On September 9, 1960, the offer to sell made by Adams, Kehr, and Caley was accepted. On September 29, 1960, petitioner was organized. On October 22, 1960, petitioner's stock certificate book reflects the issuance of 400 shares of its no par common stock to the following individuals for a total of $100,000.

| Certificate No. | Name | Shares |
|---|---|---|
| 1 | Miles W. or Nellie Tippery | 40 |
| 2 | Bruce Kehr | [1] 120 |
| 3 | John H. Caley | 80 |
| 4 | Reider Tanner | 10 |
| 5 | Melvin R. Whitman | 40 |
| 6 | Mel S. Johnston | 30 |
| 7 | Vernon O. Lundmark | 10 |
| 8 | Donald P. Christianson | [1] 20 |
| 9 | John M. Shiach | 13.33 |
| 10 | Homer V. Hartzell | 13.33 |
| 11 | Bernard J. Goiney | 13.33 |
| 12 | Mel S. Johnston | 10 |
| | | 400 |

[1] Ten of the shares issued in the name of Bruce Kehr are subject to a trust agreement as the property of Christianson and are held by Kehr as security for a loan of $5,000 made by him to Christianson to enable the latter to purchase an investment unit in petitioner.

On November 4, 1960, petitioner entered into a written agreement with Adams, Kehr, and Caley to purchase their shares in the old company for the sum of $650,000, payment to be made as follows:

(a) $10,000 upon execution of this agreement

(b) $178,500 on closing the transaction

(c) The balance of $461,500 payable in ten equal annual installments of $46,150, plus interest at 5 percent on the declining balance from the date of closing and payable on or before June 30 of each succeeding year beginning with 1961.

This agreement was closed in Seattle, Wash., on November 30, 1960.

In December 1960, petitioner issued 6-percent, 20-year debenture bonds in registered form in the total amount of $100,000. The debentures were dated October 22, 1960, and were issued to the following individuals:

| Name | Amount |
|---|---|
| Miles W. or Nellie Tippery | $10,000.00 |
| Bruce Kehr | [1]30,000.00 |
| John H. Caley | 20,000.00 |
| Melvin R. Whitman | 10,000.00 |
| Donald P. Christianson | [1]5,000.00 |
| Vernon O. Lundmark | 2,500.00 |
| Reider Tanner | 2,500.00 |
| John M. Shiach | 3,333.33 |
| Bernard J. Goiney | 3,333.33 |
| Homer V. Hartzell | 3,333.33 |
| Mel S. Johnston | 10,000.00 |
| | 100,000.00 |

[1] Of the debentures issued to Kehr, the amount of $2,500 is subject to a trust agreement as the property of Donald Christianson and is held by Kehr as security for a loan of $5,000 by him to Christianson.

On December 1, 1960, the old company and petitioner, through appropriate board of directors' and shareholders' action, entered into a joint plan of merger and agreement of merger, whereupon the old company, the wholly owned subsidiary of petitioner, was liquidated pursuant to section 332, and the assets subject to the liabilities were transferred to petitioner.

On December 1, 1960, the old company had assets with a book value of $245,504.83 and liabilities of $125,946.59. Petitioner included the assets received on liquidation at a cost of $775,946.59 (the total of the cost of the stock, $650,000, and the amount of the liabilities assumed, $125,946.59) pursuant to section 334(b)(2). The increase in the book value of assets on the merger was $530,381.76.[2]

The allocation of the step-up in basis is made on the basis of the net fair market values of the assets received (fair market value less applicable liabilities). Petitioner, therefore, estimated the net fair market values of the tram equipment and the other assets [3] and allocated the

[2] There is an unexplained discrepancy of $60 between the correct mathematical result ($530,441.76) and the amount stipulated as the increase in the book value of assets on the merger.

[3] The parties have stipulated that the fair market values of other depreciable assets determined by petitioner, with the exception of that of the tram equipment, were proper. It is also stipulated, however, that among the assets received by petitioner on liquidation was a residence located at Stevens Pass and that this asset was inadvertently omitted from the allocation shown above. They have further stipulated that as of Dec. 1, 1960, it had a fair market value of $15,000 and a remaining useful life of 15 years and that such value should be deducted from the step-up in value allocated to the tram equipment.

$650,000 purchase price of the stock to them. Petitioner determined that the old company had had no goodwill and that certain special use permits were without fair market value. It, therefore, did not allocate any portion of the step-up in basis to either item.

The Forest Service use permits allow petitioner the use of certain designated areas and improvements for a period of 20 years. They also provide, however, in pertinent part:

12. This permit is not transferable. * * *

* * * * * * *

16. If during the term of this permit or any extension thereof, the Secretary of Agriculture or any official of the Forest Service acting by or under his authority shall determine that the public interest requires termination of this permit, this permit shall terminate upon thirty days' written notice to the permittee of such determination, and the United States shall have the right thereupon to purchase the permittee's improvements, to remove them, or to require the permittee to remove them, at the option of the United States, and the United States shall be obligated to pay an equitable consideration for the improvements or for removal of the improvements and damages to the improvements resulting from their removal. * * *

17. The permittee agrees that the amount which the United States shall be required to pay for improvements in accordance with Clause 16 shall in no event exceed $550,000, and that this instrument may be introduced in any judicial proceedings for the acquisition of such improvements by the United States as the stipulation of the permittee and the United States with regard to the maximum amount which the United States shall be required to pay for the taking thereof.

The permit price of $550,000 does not include assets not located on Government land. These include: The top 300 to 400 feet of the No. 1 lift, a rope tow, and the lodge building, which have a fair market value of $50,000, $10,000, and $42,097.47,[4] respectively.

Respondent, in his statutory notice of deficiency, determined that section 334(b) (2) was inapplicable in determining the basis of the assets in question and that the basis should be determined under section 334(b) (1).

Respondent, in the alternative, determined that if section 334(b) (2) is applicable, that the amount of the step-up in basis allocated to the tram equipment was unreasonable. It is his contention that $50,000 of the purchase price of the old company stock is attributable to goodwill or to the Forest Service use permits rather than to the value of the old company's depreciable assets as computed by petitioner and, therefore, that that amount is properly allocable to either of these items.

---

[4] The only evidence adduced at trial is that the fair market value of the lodge is "about $42,000." However, petitioner's brief indicates that the fair market value of $42,097.47 has been stipulated to by the parties.

Among the assets acquired by petitioner from the old company was chair lift No. 3 (hereinafter referred to as the lift), which was in the process of being constructed at the time of the merger. The lift was completed in the fall of 1960 at a total cost of $141,985.09 and was put into service by the new company on January 1, 1961. The lift is of steel pylon and concrete base construction and frame buildings at the lower and upper terminals. The cable to which the individual cars are connected is standard wire rope, No. 619, about 1⅛ inches in diameter. The capacity of the lift is 1,200 skiers per hour. From its lower terminal the lift crosses two avalanche areas and up a sheer cliff to reach a ridge where the upper terminal is located. The average snow depth at the upper terminal is approximately 23 feet which causes pressure and stress on the installation. Normally, as part of annual maintenance procedures, parts of the installation below the level of the snow have to be repaired due to damage from snow pressure.

Adams was engaged in the operation of the ski area at Stevens Pass. He also sells and installs tram and lift equipment. He did the actual installation work on the lift. He is thoroughly familiar with the physical surroundings of Stevens Pass and with the operation of the lift.

At the present time the lift in question does not operate directly from the base lodge area. The lower terminal of the lift is located about 200 feet from the upper terminal of lift No. 1, which brings skiers up from the base lodge area. The lift was constructed as an interim step in the ultimate development of this particular area. Petitioner projected in 1960 that within 10 years a new lift would be constructed rising directly from the base lodge area to that point now served by the lift in question and that this would render the present lift obsolete or at least excess.

Petitioner, in computing the depreciation deduction on the lift, claimed a useful life of 10 years. Respondent, in his statutory notice of deficiency, determined that the useful life of the lift is 20 years.

ULTIMATE FINDING OF FACT

The useful life of the lift in the physical surroundings of Stevens Pass is 15 years.

OPINION

The first issue for determination is whether petitioner may properly compute under section 334(b)(2) the basis of assets received in the liquidation of its wholly owned subsidiary pursuant to section 332. Respondent contends that petitioner must compute the basis of the assets received under section 334(b)(1).

Section 334(b) provides, in part:

## SEC. 334. BASIS OF PROPERTY RECEIVED IN LIQUIDATIONS.

(b) LIQUIDATION OF SUBSIDIARY.—

(1) IN GENERAL.—If property is received by a corporation in a distribution in complete liquidation of another corporation (within the meaning of section 332(b)), then, except as provided in paragraph (2), the basis of the property in the hands of the distributee shall be the same as it would be in the hands of the transferor. If property is received by a corporation in a transfer to which section 332(c) applies, and if paragraph (2) of this subsection does not apply, then the basis of the property in the hands of the transferee shall be the same as it would be in the hands of the transferor.

(2) EXCEPTION.—If property is received by a corporation in a distribution in complete liquidation of another corporation (within the meaning of section 332(b)), and if—

(A) the distribution is pursuant to a plan of liquidation adopted—

(i) on or after June 22, 1954, and

(ii) not more than 2 years after the date of the transaction described in subparagraph (B) (or, in the case of a series of transactions, the date of the last such transaction) ; and

(B) stock of the distributing corporation possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote, and at least 80 percent of the total number of shares of all other classes of stock (except nonvoting stock which is limited and preferred as to dividends), was acquired by the distributee by purchase (as defined in paragraph (3)) during a period of not more than 12 months,

then the basis of the property in the hands of the distributee shall be the adjusted basis of the stock with respect to which the distribution was made. For purposes of the preceding sentence, under regulations prescribed by the Secretary or his delegate, proper adjustment in the adjusted basis of any stock shall be made for any distribution made to the distributee with respect to such stock before the adoption of the plan of liquidation, for any money received, for any liabilities assumed or subject to which the property was received, and for other items.

(3) PURCHASE DEFINED.—For purposes of paragraph (2)(B), the term "purchase" means any acquisition of stock, but only if—

(A) the basis of the stock in the hands of the distributee is not determined (i) in whole or in part by reference to the adjusted basis of such stock in the hands of the person from whom acquired, or (ii) under section 1014(a) (relating to property acquired from a decedent),

(B) the stock is not acquired in an exchange to which section 351 applies, and

(C) the stock is not acquired from a person the ownership of whose stock would, under section 318(a), be attributed to the person acquiring such stock.

The crux of the present dispute is whether petitioner acquired the stock of the old company by "purchase" as defined by section 334 (b)(3). Petitioner contends that it acquired the stock of the old company by the purchase and sale contract closed on November 30, 1960. Respondent at trial took the position that the transfer came with-

in the language of paragraph (3) (C) of section 334 (b). He has, however, failed to pursue this theory [5] and, on brief, argues that the shares acquired from Kehr and Caley were in fact acquired by petitioner in a transaction to which section 351 applied and that the exchange, therefore, falls within paragraph (3) (B) of section 334 (b). The rationale of respondent's contention is that the transaction should be viewed as an exchange by Kehr and Caley of cash and their shares of stock in the old company for stock and debentures in petitioner, plus a cash downpayment (an amount unrelated to the cash given by Kehr and Caley) and a 10-year installment obligation. Respondent then states that the cash downpayment received should be netted against the cash paid in for the stock and debentures of the petitioner. He further states that the "control" requirement of section 351 is satisfied since the outside investors contributed cash, in effect, simultaneously with the transfer by Kehr and Caley so that they all may be considered as one transferor group.

We cannot agree.

Though at first blush respondent's argument appears to have some merit, on closer inspection we are of the opinion that respondent's position requires an unwarranted extension of the scope of the nonrecognition provisions of section 351. This is the same contention respondent urged us to adopt in the case of *Charles E. Curry*, 43 T.C. 667 (1965). We declined to do so then, and we decline to do so now. The factual pattern of the *Curry* case is strikingly similar to the case before us. In *Curry*, a family group composed of Charles F. Curry and his wife (Janet), Charles E. Curry, and Carolyn Elbel (daughter of Charles F. and Janet), owned undivided interests in a building, as follows:

|  | Percent |
| --- | --- |
| Charles F. and Janet Curry | 60 |
| Charles E. Curry | 20 |
| Carolyn Elbel | 20 |

This group transferred their building to a corporation formed to purchase it for cash and notes. The shares in the purchasing corporation were held as follows:

|  | Percent |
| --- | --- |
| Charles E. Curry | 45 |
| Donald Elbel (Carolyn's husband) | 45 |
| Charles F. Curry | 10 |

The corporation took as its basis for depreciation, its cost. Respondent, however, contended that since the transaction should be properly

---

[5] In any event, we are of the opinion that sec. 334 (b) (3) (C) has no application to the factual situation before us. Respondent had urged in his opening statement that Kehr and Caley be treated collectively as one person in order to apply sec. 318. We can find no authority for such a premise.

characterized as a section 351 transfer (he argued that the notes were in fact securities), the basis to the purchasing corporation should be the transferor's basis as provided in section 362. We held that section 351 was inapplicable and stated that—

> If respondent's position were adopted, section 351 would apply even where an unrelated third party was the stockholder of the corporation. Assume, for example, a transaction identical to that involved in the instant case except that A.T. & T. was the sole shareholder of * * * [the purchasing corporation]. We cannot believe that Congress intended nonrecognition of gain in such a case. Indeed, respondent would undoubtedly be quick to object if taxpayers tried to prevent recognition by such a device. Yet it is clear that, in a sale effected in this manner, the transfers of cash for stock and property for notes are interdependent steps of a single plan. It is not a ground for distinction that two of the stockholders in the instant case were also transferors of realty, since we have found the parties were capable of independent action and intended a bona fide sale.[6] [43 T.C. at 697]

It is our opinion that this statement is equally applicable to the facts before us. We do not believe that this is a proper situation for the application of section 351.

The case of *Houck v. Hinds*, 215 F. 2d 673 (C.A. 10, 1954), which is respondent's sole citation of authority for his contention, is readily distinguishable from the case at bar. In *Houck v. Hinds, supra*, the members of a partnership sold its assets to a newly formed corporation organized by a third party for installment notes. The third party was unable to interest others in the venture, and members of the partnership then purchased his shares and subscribed for the balance of the corporate shares. The net effect was that the members of the partnership now owned the corporate shares and the corporation's installment notes in the same proportion as their old partnership interests. The Tenth Circuit held that what had occurred was the mere incorporation of the partnership in that the shares were held by the same persons and in the same proportions as the partnership interests.

The case at bar is distinguishable on its facts. We can hardly ignore the facts that, whereas in *Houck v. Hinds, supra*, the ownership remained exactly the same throughout, in this case Adams' 50-percent ownership disappeared, Kehr's 50-percent common-stock interest was reduced to less than 30 percent, Caley's 100-percent nonvoting-stock interest was changed to a 20-percent voting interest, and finally that over 50 percent of the petitioner-corporation is owned by persons who possessed no interest whatever in the old company.

We therefore hold that section 351 is inapplicable and that petitioner may properly compute the basis for the assets received under section 334(b)(2).

---

[6] The instant case, like the case of *Charles E. Curry*, 43 T.C. 667 (1965), unquestionably involves an arm's-length transaction. See also *Murphy Logging Co. v. United States*, 378 F. 2d 222 (C.A. 9, 1967).

The second issue for determination is whether the cost of the stock to petitioner, $650,000, is attributable totally to depreciable assets or whether $50,000 of that cost must be attributable to goodwill. Respondent has abandoned his determination made at trial that the entire step-up in basis was attributable to goodwill to the extent that an amount greater than $50,000 appeared in dispute. On brief he states, "It is respondent's position that the value of the depreciable assets was not greater than $600,000."

We cannot agree. It is our opinion that the record wholly supports petitioner and we can find no basis for attributing any portion of the purchase price to either goodwill or to the use permits.

The record reveals sufficient clear and uncontradicted evidence to support the finding that the depreciable assets had a fair market value in excess of $600,000. For example, the Forest Service use permit recites that the Service will pay $550,000, the stipulated value of the property of petitioner located on the Service's land, if they cancel the use permit. This figure is, of course, exclusive of the assets located on petitioner's own land. These assets, according to stipulation and uncontradicted testimony, include a lodge stipulated to have a fair market value of $42,092.47 and part of the tram equipment valued at approximately $60,000. The total of these two groups of assets is $652,092.47. We are of the opinion that such evidence is sufficient to establish the basis claimed by petitioner.

In addition, we are of the opinion that the Forest Service use permits are without fair market value. These permits were nontransferable and cancelable by the Service on 30 days' notice.

The final issue is to determine the useful life of the No. 3 lift. Respondent contends that the useful life is 20 years. Petitioner argues it is 10 years.

We are of the opinion that the true useful life lies between the positions of the two parties. The best evidence in the record is that of a tram installer, Adams, and he stated that the useful life was 12 to 15 years, and based on his testimony and the evidence adduced in the record, we are satisfied that 15 years is the correct figure. Petitioner's argument that the useful life be 10 years is based primarily on the fact that it is considering construction of a new lift which will render this one obsolete. However, as we stated in *James D. Dunn*, 42 T.C. 490, 495 (1964), "Indefinite expectations and suppositions are not enough to support a claim for obsolescense." Petitioner has shown no specific evidence that the lift will be economically obsolete in 10 years.

*Decision will be entered under Rule 50.*