*Decisions will be entered under Rule 50.*

NEW ENGLAND TANK INDUSTRIES OF NEW HAMPSHIRE, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 134–66.    Filed August 26, 1968.

*Daniel G. Holland*, for the petitioner.
*James E. Markham, Jr.*, for the respondent.

TANNENWALD, *Judge:* Respondent determined deficiencies in income tax as follows:

| TYE Oct. 31— | Deficiency |
| --- | --- |
| 1960 | $233,402.59 |
| 1961 | 626,556.97 |
| 1962 | 46,007.32 |

After concessions by the parties in regard to several items, the following issues remain for our consideration: (1) The tax treatment to be accorded $2 million paid to petitioner in the first year of its revised contract to provide the U.S. Government with certain oil storage facilities; and (2) the determination of the useful life of these facilities for depreciation purposes.

## FINDINGS OF FACT

All of the facts have been stipulated. Those facts and the exhibits attached thereto are hereby incorporated by reference.

New England Tank Industries of New Hampshire, Inc. (hereinafter referred to as petitioner), had its principal office in Cambridge, Mass., at the time of the filing of the petition herein. It also had a place of business at Newington, N.H. Petitioner filed its income tax returns on an accrual basis with the district director of internal revenue, Boston, Mass. (for fiscal years 1960 and 1962) and with the district director of internal revenue, Portsmouth, N.H. (for fiscal year 1961).

As of June 19, 1959, New England Tank Industries, Inc. (hereinafter referred to as NET), entered into a negotiated contract with the Military Petroleum Supply Agency, acting for the United States of America (hereinafter referred to as the Government), under authorization of section 416, Pub. L. 968, 84th Cong., 70 Stat. 1018.[1]

---

[1] Sec. 416 was reenacted without significant change by Pub. L. 85–861, 85th Cong., 2d Sess. (1958), 72 Stat. 1458, and is set forth as follows in 10 U.S.C. sec. 2388:

Sec. 2388. Liquid fuels: contracts for storage, handling and distribution

(a) The Secretary of a military department may contract for the storage, handling, and distribution of liquid fuels for periods of not more than five years, with options to renew for additional periods of not more than five years each, but not for more than a total of 20 years.

(b) This section applies only to facilities that conform to standards prescribed by the Secretary of Defense for protection, including dispersal, and that are in a program approved by the Secretary of Defense for the protection of petroleum facilities.

(c) A contract under this section may contain an option for the purchase by the United States of the facility covered by the contract at the expiration or termination of the contract, without regard to section 4774(d) or 9774(d) of this title, section 529 of title 31, or section 259 or 267 of title 40, and before approval of title to the underlying land by the Attorney General.

Under the contract, NET was to furnish the use of petroleum storage facilities, including tanks, buried pipelines, and dock and truck loading facilities (hereinafter collectively referred to as the facilities), along with various services in storing and handling the petroleum, for Pease Air Force Base, Newington, N.H. The facilities were to be built by NET on land owned by it. The services included receiving the fuel from tankers and/or barges and reloading and shipping the fuel from the facilities to base storage at Pease Air Force Base. In connection with the rendition of the services, NET was required, among other things, to maintain an independent standby electric-generating system, and a security system, which included armed guards, a clock reporting system, and water-supply and firefighting equipment.

The contract was to extend for a period of 5 years from the "Acceptance Date" of the facilities. The payments to be made under the contract by the Government were to commence on that date and were designated as a "Use Charge per Month" for each of six storage tanks to be provided. These charges were specified to be $743,760 per year, or a total of $3,718,800 for the 5 years involved, and were to be paid in monthly installments. An additional provision called for a per-barrel payment to NET for the use of the facilities and for services applicable to petroleum in excess of 2,600,000 barrels per contract year.

Under the contract, the Government reserved certain options, which were in substance as follows:

(1) Successive options to renew the contract for fifteen 1-year periods at annual per-barrel capacity "use charges" upon notice by the Government at least 30 days prior to the expiration date of the contract or any renewal thereof.

(2) The option to purchase the facilities, including the underlying land, during each year of the initial 5-year period and during any renewal period, at agreed prices ranging from $3,764,000 if exercised during the first year of the contract to $295,000 if exercised during the 20th year (the last year of the renewal period).

(3) The right to terminate the contract at any time for the convenience of the Government upon the payment of agreed amounts during each of the first 5 years of the contract ranging from $3,114,000 in the first year down to $1 million in the fifth year and by payment of an amount determined by formula during any renewal period.

Subsequent to the execution of the contract, NET had serious difficulty in obtaining the money to finance the construction of the facilities. Negotiations between NET and the Government to revise the contract resulted in the tentative acceptance by both parties on November 30, 1959, of change No. 2 to the contract, which provided, in substance, the following:

(1) The schedule of payments under the contract was revised to provide payments in the first year from the "Acceptance Date" totaling $2 million, rather than $743,760 as originally provided, and a reduction in payments in each of the second through the fifth years of approximately $312,000 per year.

(2) The total payments for the firm 5-year period of the contract were reduced by $166,900, primarily to offset the financing costs which the Government expected to incur in providing NET with the $1,250,000 increase in payments in the first year.

(3) The agreed prices under the option to purchase and the termination for convenience clauses were reduced for the second through the fifth years of the contract as follows:

| Year | Option prices | | Termination prices | |
|---|---|---|---|---|
| | Original contract | Change No. 2 | Original contract | Change No. 2 |
| 2d | $3,115,000 | $2,203,000 | $2,500,000 | $1,548,000 |
| 3d | 2,585,000 | 1,786,000 | 2,000,000 | 1,161,000 |
| 4th | 2,150,000 | 1,324,000 | 1,500,000 | 774,000 |
| 5th | 1,515,000 | 902,000 | 1,000,000 | 387,000 |

By contract dated November 25, 1959, J. F. White Contracting Co. agreed with NET to perform all work and furnish all materials for the construction of the facilities required under the contract between NET and the Government for the sum of $2,425,000.

Sometime prior to January 15, 1960, NET organized the petitioner herein, to be the assignee of NET's interests under the contract. On January 15, 1960, NET, petitioner, and the Government entered into an agreement whereby this assignment was effectuated.

On January 19, 1960, petitioner, as successor in interest of NET, the First National Bank of Boston, and J. F. White Contracting Co., petitioner's subcontractor, entered into a construction loan agreement (hereinafter referred to as the loan agreement), which provided, *inter alia*, that:

(1) The bank would loan petitioner $2 million with interest at the rate of 6 percent per annum, the loan to be made by a series of advances solely to make payments to the subcontractor for constructing the facilities.

(2) The bank would make payments directly to the subcontractor.

(3) All monthly payments made by the Government to petitioner under the contract would be assigned and paid to the bank until the loan was fully paid. The bank would apply these monthly payments to the outstanding loan balance, except for $8,333 which would be credited to petitioner's account to provide operating funds.

On January 28, 1960, change No. 2, as tentatively agreed on in November, was executed by the Government.

On July 21, 1960, the completed facilities were accepted by the Government. Upon acceptance, payments by the Government under the contract commenced. These payments included the following:

| | |
|---|---|
| July 21, 1960 to Oct. 31, 1960_____ | $563, 232. 95 |
| Nov. 1, 1960 to Oct. 31, 1961_____ | 1, 541, 579. 30 |
| Nov. 1, 1961 to Oct. 31, 1962_____ | 386, 034. 96 |
| Total _____ | 2, 490, 847. 21 |

For income tax purposes, the above payments were treated by petitioner as follows:[2]

| FYE Oct. 31— | Income reported | Amount treated as return of capital | Amount treated as advance receipt |
|---|---|---|---|
| 1960_____ | $99, 061. 60 | $96, 673. 63 | $367, 497. 72 |
| 1961_____ | 356, 621. 77 | 348, 025. 07 | 863, 932. 46 |
| 1962_____ | 356, 621. 77 | 348, 025. 07 | (318, 611. 88 |

The facilities exclusively service Pease Air Force Base and had been in continuous use by the Government under the contractual arrangements with petitioner from July 21, 1960, up to the time of trial.

In its income tax returns for the years here involved, petitioner computed its deduction for depreciation of the facilities by the declining-balance method, using a 10-year life. Respondent's deficiency notice computed depreciation on the basis of a 20-year life. The parties have stipulated that the facilities have a physical and useful life of at least 20 years.

OPINION

The essential facts from which the present controversy arises are clear. Petitioner's predecessor in interest, New England Tank Industries, Inc. (NET), contracted with the Military Petroleum Supply Agency (the Government) to provide the use of certain oil storage facilities and to furnish related services to Pease Air Force Base in New Hampshire. The contract, as originally agreed to, provided for a 5-year firm contract period at $743,760 per year, with successive options in the Government to renew the contract for up to 15 successive 1-year periods, and to purchase the facilities or terminate the contract for the convenience of the Government, at agreed prices, at any time during the life of the contract or any renewal thereof. NET had difficulty in securing commercial financing for the contract and, about 5 months after the original contract was signed, arranged with the Government to revise the contract to provide for the payment of $2

---

[2] There seem to be discrepancies in the figures stipulated by the parties, used by petitioner in reporting income on its tax returns, and employed by the parties on brief. These discrepancies do not affect our decision on the basic issues before us and can be resolved in the Rule 50 computation.

million rather than $743,760 during the first year. On the strength of the assignment to the bank of the payments under the revised contract, petitioner (who had succeeded to NET's interests under the contract) was able to obtain a $2 million loan from the First National Bank of Boston. This money was to be paid by the bank directly to petitioner's subcontractor who was to perform the actual construction work on the facilities.

In its income tax returns for the years involved herein, petitioner failed to include in its gross income the full amount of the payments made by the Government under the contract, allocating them instead among current income, deferred income, and return of capital. Respondent, in his notice of deficiency, challenged petitioner's treatment of the receipts under the contract and also contested petitioner's calculation of depreciation on the oil storage facilities.

### Gross Income Issue

Petitioner makes three alternative arguments in defense of its omission from gross income in the years in issue of large portions of the payments under the contract. We shall consider each contention separately.

1. *Loan versus Income.*—Petitioner contends that the excess of $1,250,000 paid by the Government to the First National Bank of Boston in the first year of the contract pursuant to petitioner's assignment under the loan agreement was, in effect, a loan to petitioner and did not constitute income for tax purposes when such excess payments were made.[3] We cannot agree.

Petitioner places great weight on what might have happened when the contract was revised. Petitoner argues that, "Had Defense [Department] cast the additional $1,250,000 first year payment in the form of a loan to the petitioner and had the petitioner agreed to repay the loan at an annual rate of $312,500 during each of the four years following the first year of the contract term, the Commissioner would certainly not contend that the $1,250,000 was includable in taxable income of the first year." Even assuming that petitioner is correct in this position—a conclusion that is not entirely free from doubt (see *United States* v. *Williams*, 395 F. 2d 508 (C.A. 5, 1968))—the fact is that the within transaction was not cast in this mold. While the substance-versus-form argument has its applications in the tax area, it does not constitute a license, much less a mandate, for us to turn fiction into fact, as petitioner herein suggests. In the last analysis, the

---

[3] Petitioner makes no contention that the fact that the payments were made to the bank in satisfaction of its note, rather than to itself, has any effect on the taxability of the payments. "It cannot be questioned that the payment of a taxpayer's indebtedness by a third party pursuant to an agreement between them is income to the taxpayer." *Wall* v. *United States. 164 F. 2d 462. 464 (C.A. 4, 1947)*.

tax consequences of a transaction must be determined on the basis of what was actually done rather than on what might have been done. See *Byron H. Farwell*, 35 T.C. 454, 466 (1960) ; *Television Industries, Inc.*, 32 T.C. 1297, 1302 (1959), affd. 284 F. 2d 322 (C.A. 2, 1960).

We see no need to recapitulate the numerous criteria, which have been developed by the courts, for determining whether a particular payment is a loan. The decided cases are legion in this area and establish that, in the final analysis, the question depends upon the facts and circumstances of each case.

The hard fact is that there is not one solid indication of a loan present in the instant case. Not only was no note or other evidence of indebtedness given, but there was no obligation (conditional or unconditional) on the part of petitioner to pay a sum (certain or uncertain) at any fixed or other maturity date. At no point in the documents is the relationship described in any terms other than the Government as the user of facilities and services and petitioner as the furnisher thereof. No payments were due under the contract until the Government had accepted the completed facilities. The bank was willing to loan petitioner $2 million so that the facilities could be constructed, taking as security the assignment of the payments by the Government. The fact that the Government may have agreed to revise the original schedule and to accelerate the payments, in order to aid petitioner by inducing the bank to make the loan, does not mean that the Government intended to loan the petitioner any money. Rather, it appears to us that the Government was in fact unwilling to loan any money to petitioner and was requiring petitioner, at risk of default, to secure a commercial loan to finance the contract.

Perhaps petitioner might have been financially responsible for damages in the event of a default, but certainly such responsibility cannot be equated with the normal indicia of a debtor-creditor relationship. The only factor in petitioner's favor is that there was a reduction of $166,900 in the aggregate amount payable by the Government during the initial 5-year period. Petitioner argues that this, in effect, represents payment of interest by it on the $1,250,000 and is evidence of a loan. The fact is that this was compensation to the Government to cover *its cost of borrowing* the advance payments and in no way represented interest paid by petitioner on moneys borrowed by it. It was nothing more than compensation for the advance payment.

We think that both in form and in substance the changes in the contract represented merely a restructuring of the schedule of payments for the furnishing of facilities and services and that $1,250,000 paid in the first year did not constitute a loan. *United States* v. *Williams, supra; Bouchard* v. *Commissioner*, 229 F. 2d 703 (C.A. 7, 1956), affirming a Memorandum Opinion of this Court; *Hagen Advertising*

*Displays, Inc.*, 47 T.C. 139, 146 (1966), on appeal (C.A. 6, Apr. 3, 1967).

2. *Advance Receipts.*—Petitioner argues in the alternative that if the $1,250,000 does not constitute a loan, it represents advance payments which need not be reported for tax purposes until later years when the services under the contract are to be performed. Petitioner asserts that the decided cases do not prevent the deferral of income where there is a precise and accurate accounting method for such deferral. Even if we assume that such a method existed herein (something that is far from clear), this Court has consistently rejected the contention that the Supreme Court decision in *Schlude* v. *Commissioner*, 372 U.S. 128 (1963), can be so qualified and has held that deferral of income arising from payments actually received can be predicated only on specific statutory authorization, which clearly does not exist as far as the instant case is concerned.[4] *Artnell Co.*, 48 T.C. 411 (1967), on appeal (C.A. 7, Oct. 23, 1967); *Hagen Advertising Displays, Inc., supra; Decision, Inc.*, 47 T.C. 58 (1966); *E. Morris Cox*, 43 T.C. 448 (1965). Moreover, to the extent that such payments were for the use of facilities and therefore in the nature of rent, they were clearly includable in gross income in the year received. *United States* v. *Williams, supra.*

3. *Return of Capital versus Income.*—Petitioner's final contention is that it is entitled to treat a portion of each payment made to it by the Government as a nontaxable return of capital because the "monthly use charges" paid under the contract had the effect of giving the Government a substantial "equity" in the property.

This contention turns essentially on a determination—also factual—whether, from all the facts and circumstances, the parties intended a sale. *Karl R. Martin*, 44 T.C. 731 (1965), affirmed on this issue 379 F. 2d 282 (C.A. 6, 1967).

Unreasonably high "use charges" during the term of the contract could be an important factor in any such determination. *Truman Bowen*, 12 T.C. 446 (1949); *Holeproof Hosiery Co.*, 11 B.T.A. 547 (1928). Petitioner argues that the "use charges" payable during the initial 5-year period of the contract were so large in relation to the option price and the cost of the facilities that it was contemplated that a portion of the use charges would result in an equity in the property in the Government. Since the agreement between the parties herein calls for the rendition of substantial services along with the right to use the property, there is a fatal flaw in petitioner's argument. In such a situation, the fact that the payments may loom large in relation to the option price or the cost of the facilities does not in any way

---

[4] In light of this conclusion, we need not consider respondent's argument that the $1,250,000 did not constitute an advance receipt at all but was rather payment for facilities furnished and services performed entirely in the first year of the contract.

establish that the payments were made to acquire an equity in the property, for it is equally possible that they merely reflect the fair value of the services to be rendered along with the right to use the facilities. Since petitioner has failed to establish what the fair value of these services was, we are unable to conclude that the "use charges" under the contract were unreasonably high.

Another factor of significance is whether the option price was set at less than the expected fair market value of the property at the time the option was to be exercised. *D. M. Haggard*, 24 T.C. 1124 (1955), aff'd. 241 F. 2d 288 (C.A. 9, 1956). Petitioner argues that the Government, by payment of $715,000 at the end of the firm 5-year period, could secure transfer of title to property that 5 years earlier had cost $2,450,000. This argument is without merit. Petitioner has failed to produce any evidence from which the fair market value of the property at the end of the 5-year period might be established. The fact that, at the beginning of the 5-year period, the property was worth $2,450,000 does not mean that $715,000 was not a fair approximation of its market value at the end of the period, as petitioner's argument seems to imply. Finally, the fact that so relatively substantial a sum as $715,000 remained to be paid at that point in time before the Government would become the owner of the property is evidence that a sale was not intended by the parties. See *Breece Veneer & Panel Co.* v. *Commissioner*, 232 F. 2d 319, 322 (C.A. 7, 1956), reversing 22 T.C. 1386 (1954).

*Haggard* v. *Commissioner*, 241 F. 2d 288 (C.A. 9, 1956), affirming 24 T.C. 1124 (1955), and *Beus* v. *Commissioner*, 261 F. 2d 176 (C.A. 9, 1958), affirming 28 T.C. 1133 (1957), relied upon by petitioner, are clearly distinguishable on their facts.

Petitioner makes the additional argument that Congress, in enacting section 416 of Public Law 968 (see fn. 1, *supra*), intended that a portion of the monthly payments under the oil storage contracts should be considered payments of the price to be paid under the Government's option to purchase. We take the thrust of the argument to be that we must therefore conclude that the parties intended a sale. Assuming without deciding that such a conclusion would necessarily follow under appropriate circumstances, we see no indications of such congressional intent in the legislative history of the section. H.R. 9893, 84th Cong., 2d Sess. (1956); H. Rept. No. 1890, 84th Cong., 2d Sess. (1956); S. Rept. No. 2364, 84th Cong., 2d Sess. (1956); H. Rept. No. 2641, 84th Cong., 2d Sess. (1956); H.R. 12270, 84th Cong., 2d Sess. (1956); S. Rept. No. 2775, 84th Cong., 2d Sess. (1956); Hearings before the Subcommittee on Real Estate and Military Construction of the Senate Committee on Armed Services, 84th Cong., 2d Sess., pp. 789–794 (1956); H.R. 8943, 85th Cong., 1st Sess. (1957); H. Rept. No. 930, 85th Cong., 1st Sess. (1957); S. Rept. No. 2095, 85th Cong., 2d Sess. (1958). That history shows that Congress in-

tended exactly what the section on its face indicates, i.e., that the military departments would contract for the use of petroleum storage facilities and the handling and distribution of the petroleum and that these contracts might provide for an option to purchase at their termination or expiration.

In sum, petitioner has failed to adduce any convincing evidence which would permit us to conclude that the contract was anything other than what it purported to be, i.e., a contract for use of facilities and the furnishing of related services. We hold that there was no sale.[5]

## Depreciation Issue

Petitioner claimed depreciation under section 167 [6] in its tax returns based on a 10-year life for the facilities. It now claims that use of the 10-year figure was in error and that the appropriate period to be used in computing depreciation is 5 years. Respondent's deficiency notice asserted that a 20-year period was proper.[7]

At the outset, we note that, for the purposes of this issue, petitioner is a lessor-owner of the property. Unlike the lessee who constructs improvements on leased premises, petitioner herein would continue to own the facilities after the termination of the contract with the Government (whether at the end of the firm 5-year period or any subsequent renewal period) and would retain the right to continue to put the facilities to use in its business. In this context, the plethora of cases involving the right of a lessee to depreciate improvements, which he constructs, over the period of the lease are by and large inapplicable. See 4 Mertens, Law of Federal Income Taxation sec. 23.92–23.96 (Riordan rev. 1966), and cases cited therein.

---

[5] Because of our decision that petitioner has failed to establish that the Government was acquiring an "equity" in the facilities, we need not decide the question of whether petitioner may apportion the payments received by it between income earned under the contract and sale price. Cf. *Wilshire Holding Corporation* v. *Commissioner*, 262 F. 2d 51 (C.A. 9, 1958). Compare the language of sec. 61, I.R.C. 1954, which would apply to petitioner herein as a "lessor-seller," and sec. 162(a)(3), I.R.C. 1954, which governed the "lessee-purchaser" in *Wilshire Holding Corporation* v. *Commissioner, supra*. See Note, "Tax Treatment of the Lease With Option To Purchase: Is Allocation the Answer?", 11 Tax L. Rev. 74 (1955).

[6] SEC. 167. DEPRECIATION.
    (a) GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—
        (1) of property used in the trade or business, or
        (2) of property held for the production of income.

[7] On oral argument at the trial, respondent indicated it was acceding to a 12-year life but claimed that salvage value should be taken into account. On brief, however, respondent returned to his position that a 20-year life should be used and petitioner made no reference to respondent's purported modification of his original position. If a problem still exists in this regard, it can be disposed of under the Rule 50 computation. In any event, since petitioner appears to have used the declining-balance method of computing depreciation, salvage value would appear to be involved only for the purpose of determining the amount below which no depreciation can be taken and not for the purpose of determining the annual rate. *Hertz Corp.* v. *United States*, 364 U.S. 122 (1960); sec. 1.167(b)–2, Income Tax Regs.

Concededly, the useful life of an asset must be related to the period for which it may reasonably be expected to be used by the taxpayer. *Massey Motors* v. *United States*, 364 U.S. 92 (1960) ; sec. 1.167(a)–1(b), Income Tax Regs. The parties have stipulated that the physical and useful life of the facilities is 20 years. Such being the case, it is incumbent upon petitioner to prove that the period of its use of the facilities was shorter. *James D. Dunn*, 42 T.C. 490 (1964).

Essentially, petitioner's position rests exclusively on the fact that the contract with the Government was firm for only 5 years and that there is no evidence that it would probably be renewed. Thus, petitioner argues on brief :

The fact that the Government *may* elect to exercise its option to extend the term of the contract is merely a highly speculative possibility. Many decisions of a military or security nature could influence the continuance or closing down of the Pease Air Force Base. Technological considerations, likewise, could be an important factor in the necessity for the petitioner's facilities to serve Pease Air Force Base.

Even on the assumption that the validity of petitioner's claim turns exclusively upon the probability of nonrenewal by the Government, petitioner has furnished us with no proof with respect thereto. Determination as to the period of the use of an asset in a taxpayer's business must be based upon facts known or reasonably anticipated at the time the return is filed. *Westinghouse Broadcasting Co.*, 36 T.C. 912, 921 (1961), affd. 309 F. 2d 279 (C.A. 3, 1962) ; sec. 1.167(b)–0(a), Income Tax Regs. The record herein is utterly silent as to the existence at the time petitioner's returns were filed of any facts, either by way of "decisions of a military or security nature" or "technological considerations," which would even tend to establish that the Government would probably not renew the contract for the full 20-year term. In actuality, the only indication in the record as to the attitude of the Government on the subject of renewal is the fact that in 1967, 7 years after the completion of the facilities and 2 years after the expiration of the firm period of the contract, the Government was still using the facilities.

Petitioner argues that Congress intended, in passing section 416 of Public Law 968, that the contractor be allowed to amortize the petroleum storage facilities over the firm period of the contract. Although there is some mention in the Senate hearings concerning amortization of the "additional costs" during the "firm period" of the contract,[8]

---

[8] See Hearing, Before Senate Subcommittee on Real Estate and Military Construction of Committee on Armed Services on S. 3122, 84th Cong., 2d Sess., p. 794 (1956) :
"It has been determined that the commercial petroleum storage industry will not undertake a program—to provide protected or dispersed storage for military products—unless it is assured that the additional costs which are expended for protection or dispersal (costs over and above the commercial value of the storage if vacated by the military services) are amortized during the firm contract period. This period is now limited to 1 year. Industry wants some assurance that the military will continue to occupy the storage for longer periods."

we do not think such statements are sufficient indication of congressional intent to justify the conclusion that petitioner should be the recipient of such favored tax treatment. If Congress had intended such a tax benefit to flow from this section of the Military Construction Act, it surely would have expressed it in more certain terms than we have been able to find in section 416 or its legislative history. Cf. secs. 168 and 169, I.R.C. 1954.

The same failure of proof exists with respect to the potentiality of use of the facilities to petitioner in the event that the Government had failed to renew the contract. There is not a shred of evidence indicating that such use would be so reduced or minimized that the period for depreciation should be less than 20 years. *Lassen Lumber & Box Co.*, 6 B.T.A. 241 (1927). We need not decide whether the termination of the contract might justify a deduction for obsolescence at that time, sinch such event would have occurred, if at all, in a year not before us.

Whether petitioner's claim is viewed as one for depreciation or endemic obsolescence, its position has too gossamer a quality to be sustained. We uphold respondent's determination that petitioner must use a 20-year period. *Western Terminal Co.* v. *United States*, an unreported case (E.D. Wash. 1967, 20 A.F.T.R. 2d 5485, 67-2 U.S.T.C. par. 9674) ; *Lassen Lumber & Box Co., supra; James D. Dunn, supra; Stevens Pass, Inc.*, 48 T.C. 532, 541 (1967) ; cf. *Westinghouse Broadcasting Co., supra;* but see fn. 7, *supra.*[9]

*Decision will be entered under Rule 50.*

