AIRPORT BUILDING DEVELOPMENT CORPORATION, PETITIONER *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2233–70.    Filed June 26, 1972.

*Arthur P. Generaux, Jr.*, for the petitioner.
*Earl Goldhammer*, for the respondent.

SCOTT, *Judge:* Respondent determined deficiencies in petitioner's Federal income tax for the years and in the amounts as follows:

| Taxable year ended | Amount |
|---|---|
| March 31, 1967 | $21, 921. 22 |
| March 31, 1968 | 26, 606. 28 |

The issue for decision is whether the useful life of certain leasehold improvements for purposes of computing depreciation deductions is the 10-year remaining term of petitioner's lease, or the lesser period based on the initial term of a sublease by petitioner of the premises.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner, Airport Building Development Corp., was incorporated in the State of California on April 9, 1953. Its principal place of business at the time of the filing of the petition in this case was Los Angeles, Calif. Petitioner filed its corporate Federal income tax returns for its fiscal years ending March 31, 1967, and March 31, 1968, with the district director of internal revenue, Los Angeles, Calif.

Irving P. Crowell (hereinafter referred to as Crowell) is now and has been since 1953 the president of petitioner and owner of 50 percent

of its stock. Paula Crowell, his wife, is the secretary-treasurer of petitioner and owner of the remaining 50 percent of its stock. Petitioner is engaged in the business of leasing industrial real estate.

Crowell devotes all of his working time to supervising petitioner's business. Crowell began work in the construction business in 1922. He subsequently engaged in the leasing of buildings which he constructed and during the taxable years in issue was a licensed real estate salesman. Crowell possessed extensive experience in both construction and real estate leasing in southern California.

On July 7, 1953, petitioner entered into a ground lease with the City of Los Angeles for an unimproved portion of airport property located at 11099 South La Cienega Boulevard, Los Angeles, Calif. (hereinafter referred to as the airport property). The lease with the City of Los Angeles was for a term commencing July 1, 1953, and ending on June 30, 1959.

On July 7, 1953, petitioner entered into an option agreement with the City of Los Angeles to extend the term of the lease on the above-designated airport property. The option agreement provided for three options to extend the lease for periods of 5 years each.

By amendment to the lease executed on March 4, 1966, by petitioner and the City of Los Angeles the term of the lease was to expire on December 14, 1975.

On July 7, 1953, petitioner subleased the airport property to North American Aviation, Inc. (hereinafter referred to as North American), for an initial term of 5 years and 8 months. The sublease also provided for three renewal options of 5 years each.

Pursuant to the provisions of the sublease with North American petitioner erected on the property a steel and concrete hangar-type building having an area of approximately 126,000 square feet. The building was without windows and had two large doors at each end which were 58 feet wide and 18 feet high. On one side was a truck bay with loading docks and on the other were three large portals through which aircraft could pass.

North American used the building leased from petitioner for the purpose of assembling jet aircraft. After having occupied the premises for approximately 11 years, North American canceled its lease and vacated the premises in 1965.

On September 7, 1965, petitioner entered into a sublease with the United States of America, negotiated by the General Services Administration (hereinafter referred to as GSA) for the purpose of providing office facilities for the Defense Contract Administration Services Region (hereinafter referred to as DCASR) which was a new government agency in the Los Angeles area in 1965.

The term of petitioner's sublease to the United States of America

was 5 years beginning on December 15, 1965, and ending on December 14, 1970. Under the lease the United States had an option to renew its lease for an additional 5-year term and could terminate at any time during the renewal term upon notice in writing to petitioner given at least 180 days prior to the termination date.[1]

The terms of the sublease required petitioner as sublessor to construct certain improvements in the one-story steel and concrete building so as to convert the building to an office facility. The total cost of the improvements was approximately $574,383. The improvements consisted of floor covering, partitions and doors to divide the building into offices, air conditioning, electrical and plumbing modifications, construction of a suspended ceiling, and a fire protection sprinkling system.

In order to finance the improvements and pay for miscellaneous expenditures, petitioner borrowed $650,000 from Allstate Life Insurance Co. The provisions of the loan agreement required repayment of the loan within 5 years.

The original sublease to the United States provided for an annual rental of $340,575 to be paid to petitioner over the first 5-year term, and an annual rental of $326,952 to be paid to petitioner during the 5-year renewal term.

The sublease was amended nine times between the date of its execution and March 31, 1968. The amendments provided for additional rental space, additional janitorial services, additional modifications to the building, and for an increased rental to be paid to petitioner as of December 1, 1967. Petitioner was to be paid $370,627.50 per annum during the balance of the 5-year sublease and the 5-year renewal term.

Sometime during 1967, GSA leased on behalf of the United States a building located at 11055 South La Cienega Boulevard (hereinafter referred to as the annex) which was across the street from the airport property leased by petitioner, and which was also occupied by DCASR. The initial term of the lease was 5 years with an option to renew for a period in excess of 2 years. Thus, the expiration of the lease renewal periods on both the annex and airport properties would coincide.

Petitioner computed depreciation on the lease improvements made for the occupancy of the property by DCASR on a 5-year useful life. Respondent in his notice of deficiency determined the useful life of the improvements to be 10 years.

ULTIMATE FINDING OF FACT

The leasehold improvements constructed by petitioner in 1965 had a useful life for tax purposes of 10 years.

---

[1] The United States did exercise its option to renew and DCASR was occupying the airport property as of the time of trial of this case.

OPINION

Section 167, I.R.C. 1954,[2] allows a deduction for the depreciation of assets used in the taxpayer's trade or business. The allowance for depreciation is to be prorated over the useful life of the asset which may or may not coincide with the physical life of the asset. The useful life of an asset must be related to the period over which it may reasonably be expected to be utilized in the taxpayer's trade or business. *Massey Motors* v. *United States*, 364 U.S. 92 (1960); sec. 1.167(a)–1(b), Income Tax Regs. The determination of the useful life of an asset in a taxpayer's business must be based on facts which are known or reasonably anticipated at the time the return is filed. *Westinghouse Broadcasting Co.*, 36 T.C. 912, 921 (1961), affd. 309 F. 2d 279 (C.A. 3, 1962), certiorari denied 372 U.S. 935 (1963).

Respondent determined the economic useful life of the improvements constructed by petitioner in 1965 to be 10 years, or the remaining term of petitioner's lease with the City of Los Angeles. Therefore, here, as in *New England Tank Industries, Inc.*, 50 T.C. 771, 780 (1968), affirmed per curiam 413 F. 2d 1038 (C.A. 1, 1969), the cases involving the right of a lessee "to depreciate improvements, which he constructs, over the period of the lease are by and large inapplicable."

Petitioner in this case contends that the economic useful life for depreciation purposes of the improvements it constructed in 1965 is not the term of its lease of the airport property but rather is 5 years, which is the term of its sublease with the United States. In support of its position, petitioner contends (a) that there was no means of predicting whether the United States would exercise its option of renewal, which even if exercised could be canceled on 180 days' advance notice, and (b) that there was no reasonable expectation that another sublessee could be found to use these same improvements erected to meet the needs of DCASR in the event that the United States did not exercise its option of renewal.

The contention that the term of a contract limits the useful life of an asset has been before this Court in various factual situations in a number of cases. In *Lassen Lumber & Box Co.*, 6 B.T.A. 241, 248 (1927), affd. 27 F. 2d 17 (C.A. 9, 1928), we stated that in order for a taxpayer to be entitled to depreciate an asset over the term of a contract, it must show "that there was a practical certainty that it could not use its assets for the purposes of its business after the expiration

---

[2] SEC. 167. DEPRECIATION.

(a) GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

    (1) of property used in the trade or business, or

    (2) of property held for the production of income.

of such contract." The showing of "A possibility or mere probability is not enough." *Lassen Lumber & Box Co.* v. *Blair,* 27 F. 2d 17, 19–20 (C.A. 9, 1928). See also *New England Tank Industries, Inc., supra.*

Petitioner presented expert testimony to the effect that had the United States not exercised its option to renew the lease at the expiration of the initial 5-year term, it would have been extremely difficult to find a tenant to occupy the entire facilities and improvements as they existed. This testimony indicated that the improvements constructed by petitioner would have little, if any, salvage value to petitioner in the event that the building on the airport property was vacated by DCASR and another sublessee for the building as it then existed could not be found.

Respondent produced expert testimony to the effect that generally leases negotiated by GSA on behalf of the Federal Government in the southern California area were for 5-year terms. Most of those had termination clauses allowing the government to cancel its lease on 30 to 60 days' notice. The remainder were for 5-year firm terms. A limited number provided for the Government to have a renewal option, and in every instance where such an option was a provision in the lease it was exercised. Before GSA could exercise an option to renew a lease, it had to ascertain whether federally owned facilities were available which might be suitable to the needs of the tenant agency.

The testimony of William Hoffmann, a supervisory realty officer for GSA, indicated that GSA experienced a constant increase in its needs for leased space in the southern California area and had DCASR requested to vacate petitioner's premises, GSA would have considered placing another agency in that facility. Hoffmann testified that a decision to either terminate a lease or exercise an option to renew would be strictly motivated by the needs of the Government.

Based upon the record before us, we conclude that petitioner has failed to demonstrate that there existed a reasonable certainty that the economic useful life of the leasehold improvements would end with the expiration of the initial term of its sublease with the United States. While petitioner has shown that there was a possibility that the Government would not exercise its option to renew, or having renewed that it would terminate, petitioner has not even demonstrated that there was a probability of nonrenewal or termination, and certainly not that there was a reasonable certainty of nonrenewal or termination. See *New England Tank Industries, Inc., supra,* and *Lassen Lumber & Box Co., supra.*

Petitioner has likewise failed to demonstrate that there existed a reasonable certainty that it would be unable to locate another tenant to occupy the airport property should the United States not exercise its option to renew, or having exercised that option, elect to terminate

the lease. Petitioner's own witness testified that he "anticipated a great deal of difficulty in reletting it for office use," and that it would be very difficult to find a tenant to occupy the entire office facilities and improvements as they existed. This testimony, particularly when considered in conjunction with that of Hoffmann, the GSA realty officer, to the effect that there was an increasing need on the part of the Government for space, manifests anything but a reasonable certainty that petitioner would be unable to find another lessee.

Having concluded that petitioner has failed to demonstrate that there existed a reasonable certainty that the economic useful life of the improvements constructed in 1965 on the airport property was limited to the initial term of its lease with the United States, we hold that petitioner has failed to show error in respondent's determination that the useful life of these improvements was 10 years, the remaining term of petitioner's lease of the airport property from the City of Los Angeles. *New England Tank Industries, Inc., supra,* and *Westinghouse Broadcasting Co., supra.*

*Decision will be entered for respondent.*